**STATE of Missouri, Respondent,**

v.

**Daniel M. REETER, Appellant.**

**Daniel M. REETER, Respondent,**

v.

**STATE of Missouri, Appellant.**

**Nos. WD 44855, WD 45917 and WD 45968.**

Missouri Court of Appeals, Western District.

Feb. 23, 1993.

Ellen H. Flottman, Office of the State Public Defender, Columbia, for appellant.

Philip M. Koppe, Asst. Atty. Gen., Kansas City, for respondent.

Before ULRICH, P.J., and BRECKENRIDGE and HANNA, JJ.

HANNA, Judge.

This is a consolidated appeal by appellant Reeter ("defendant") from his convictions as a "prior offender" for two counts of assault second degree and burglary first degree, and consecutive sentences of seven, seven, and fifteen years. The sentences were imposed following a jury trial in the Circuit Court of Callaway County, Missouri, on a change of venue from Boone County, Missouri. The defendant's criminal convictions are consolidated with his Rule 29.15 motion, which was denied following an evidentiary hearing.

The defendant was charged by a second Information with two counts of assault first degree (§ 565.050)[1] and one count of

---

1. All statutory references are to the Revised Statutes of Missouri 1986, unless otherwise indicated.

burglary first degree (§ 569.160). The defendant was charged as a prior offender pursuant to § 558.016.2, based upon a January 1986 plea to the charge of assault second degree.

The defendant's jury trial began April 10, 1991, and concluded April 11 with verdicts of guilt of assault second degree (§ 565.060) under counts I and II and burglary first degree under count III. The defendant was sentenced to consecutive terms of imprisonment of seven, seven, and fifteen years.

These sentences were set aside by the trial judge on December 3, 1991, because of the negligent failure of the defendant's trial attorney to file a motion for a new trial. A motion for new trial was filed, which was overruled, on January 13, 1992. On February 10, 1992, the defendant was sentenced to the original terms. Both the underlying criminal trial and the Rule 29.15 hearing were presided over by Judge Ellen S. Roper.

The evidence presented at trial showed that on September 1, 1990, Linda Diann Campbell (then Linda Reeter), was separated from her husband, the defendant, and living with her three children in a trailer court in Hallsville, Missouri, approximately fourteen miles north of Columbia, Missouri. Ms. Campbell filed for divorce. During the proceedings, Ms. Campbell found it necessary to obtain an *ex parte* order of protection against the defendant and he subsequently was found to have violated the order by making harassing telephone calls to his wife. He received a thirty day jail sentence with suspended execution of sentence and was placed on two years unsupervised probation.

Ms. Campbell began dating Jeffery Staats and on August 31, 1990, arrived home after spending the evening at a barbecue in Hallsville. Because Mr. Staats had been drinking heavily and was in no condition to drive his motorcycle, it was agreed he would ride home with Ms. Campbell and her children, and spend the night at her trailer. She and Mr. Staats slept on two futons in the living room.

Around 7:30 the following morning, Ms. Campbell heard a car door slam and the defendant yelling her name. Ms. Campbell identified the voice as that of the defendant and since he had threatened to kill her many times, ran to the door to make sure it was locked and found that it was. The defendant began pounding on the door and Ms. Campbell told him to leave or she was going to call the police. The defendant suggested in rather unpleasant terms that he was going to kick the door in, which he did. As he grabbed Ms. Campbell, he saw Mr. Staats and asked him who he was. Mr. Staats identified himself and the defendant started hitting Mr. Staats repeatedly in the face. Mr. Staats fell to the floor and the defendant began kicking him in the head and ribs. Ms. Campbell ran into the kitchen, where the telephone was located. She then dialed 9-1-1, gave the police her address, and urged their quick response because she thought she was going to be killed. An audio tape of the 9-1-1 call to the Hallsville Police Department was played to the jury. Mr. Staats can be heard moaning in the background.

Before the call could be completed, the defendant came into the kitchen and jerked the telephone cord out of the wall. Ms. Campbell had backed into a corner and the defendant shoved the kitchen table up against her thighs with such force that two of the table legs broke, knocking Ms. Campbell to the floor. Defendant grabbed her by the hair, pulled her up over the table, began punching her in the face and throwing her around the kitchen. At one point, he grabbed the back of her hair and slammed her face down on a canister.

During this time, Mr. Staats was lying on the floor, bleeding and barely conscious. He struggled to his feet at one point, but the defendant came back into the living room, knocked him down and kicked him some more, rendering him unconscious. The defendant resumed beating Ms. Campbell, and the beating continued until their children came down the hallway yelling at their father to stop. He responded, "Kids, I love you, but your mother's a no good slut." He then punched Ms. Campbell several times in the back, in her kidneys, fin-

ishing with a question, "How's that for a kidney punch, Baby?" He walked out of the trailer and said, "Go ahead and call the cops now, bitch." A neighbor characterized the defendant as he was leaving that "he was snickering about it," like he thought "it was funny."

When the Hallsville police officer arrived at the scene, he found Ms. Campbell dizzy, confused and bleeding profusely. She was cut in several places and there was blood on her clothes. He observed a footprint on the main wooden door to the trailer and the interior was in disarray. The kitchen table seemed to be broken and other items were dumped on the floor. There was blood on the kitchen countertop, on one of the two futons in the living room, and on the linoleum flooring.

Mr. Staats suffered numerous bruises and cuts as a result of the beating. A cut over his left eye required fourteen stitches and was still visibly scarred at the time of trial, some seven months later. Ms. Campbell suffered multiple bruises and abrasions, including a small laceration over the eyebrow, which required stitches, and a small puncture wound over her left ear. She had marked swelling over her right eye and suffered from double vision and acute sensitivity to any light exposure. The area above her kidney was bruised and tender. X-rays revealed that the floor of her right eye socket had been fractured "and that a portion of the orbital contents were down in the fracture," causing double vision. Her eye socket was restructured with a titanium plate, but she still suffered from occasional severe headaches and double vision at the time of trial. She was hospitalized as a result of the beating.

On September 11, 1991, defendant filed a pro se Rule 29.15 motion seeking to set aside his convictions. The motion was accompanied by a pro se "Motion for Change of Judge." The motion alleged, among other things, that the defendant's trial attorney had been ineffective in failing to file a motion for new trial and that he had been denied due process because of the judge's refusal to recuse herself on the ground that she had presided at the defendant's dissolution of marriage proceeding. A first amended motion filed by his court appointed attorney added claims that his trial attorney failed to object to the submission of the criminal case to the jury at a late hour.

Defendant testified at the Rule 29.15 hearing that his original attorney was ineffective in failing to request a change of judge, since Judge Roper had presided at his dissolution hearing held September 4, 1990, three days after the incident for which the defendant had been charged and convicted. He described the victim's appearance that she had a "bag" over her right eye, had to be helped to the witness stand by her mother, and "didn't look very good." His trial attorney explained he did not file a motion for new trial because he was concerned the defendant might be recharged with assault first degree. Further, he felt there was no basis for objecting to the submission of the case to the jury at 10:13 p.m. He noted he had been involved in trials where the jury had stayed out all night in Callaway County, so he didn't think this one was particularly unusual.

Subsequently, the motion judge entered an order, together with findings of fact and conclusions of law, overruling the defendant's Rule 29.15 motion except for the claim that counsel was ineffective for failing to file a motion for new trial. The court held the trial attorney ineffective and sustained that part of the motion and ordered the defendant's sentence vacated for the purpose of allowing the defendant's new counsel to file a motion for new trial. A motion for new trial was filed and subsequently overruled.

Defendant's first point deals with the change of judge motions filed before Judge Roper. He claims that the court erred by failing to sustain his motion for an automatic change of judge filed pursuant to Rule 32.07 in the underlying criminal case and pursuant to Rule 51.05 in the post-conviction motion. Alternatively, he contends the judge should have recused herself under the provisions of Rule 2, Canon 3(C), which requires a judge to disqualify herself if she has a personal bias or preju-

dice concerning a party, "or personal knowledge of disputed evidentiary facts concerning the proceeding."

■ The domestic relations matter was heard before Judge Roper on September 4, 1990. The criminal case was assigned to Judge Roper on December 17, 1990. Rule 32.07 provides one automatic change of judge in a criminal proceeding upon written application of any party. In a felony case, the application must be filed no later than thirty days after designation of the trial judge and notification to the parties or their attorneys. The defendant's application for change of judge was not filed until April 4, 1991, almost four months later. The defendant was present at the dissolution hearing on September 4, 1990, and was aware Judge Roper presided. When she was assigned the case on December 17, 1990, he had thirty days to consider whether to file a motion for change of judge, knowing she had heard his domestic case. He did not file the motion and therefore, he waived his right to the automatic change of judge. *State v. Owens,* 759 S.W.2d 73, 74 (Mo.App.1988).

■ He further complains that his motion for change of judge filed pursuant to Rule 51.05 and filed contemporaneously with his Rule 29.15 motion should have been sustained. This issue was considered in *Thomas v. State,* 808 S.W.2d 364, 366 (Mo. banc 1991), where the court held the change of judge provision is not applicable to post-conviction proceedings. The Missouri Supreme Court eliminated the automatic change of judge provisions from Rule 51.05 when either Rules 24.035 or 29.15 motions are concerned. *Id.* at 366–367.

■ Defendant argues that if neither of the foregoing change of judge provisions are appropriate, Judge Roper should have recused herself from the underlying criminal case as mandated by Rule 2, Canon 3(C)(1)(a) since she was biased and prejudiced from the knowledge gained from having presided over the domestic case. Missouri Supreme Court Rule 2 contains the Canons of Ethics for the Missouri Judiciary. Canon 3(C)(1) is as follows:

(1) A judge should disqualify himself in a proceeding in which his impartiality might reasonably be questioned, including but not limited to instances where:

(a) he has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding. . . .

He points out that the judge had personal knowledge of the victim's injuries, as a result of the domestic hearing, when she appeared in court not looking too good. Ms. Campbell had come directly from the hospital to the hearing. The defendant cites us to *State v. Lovelady,* 691 S.W.2d 364, 365 (Mo.App.1985), where the court emphasized the importance of a neutral arbiter to our system of justice. We, of course, have no quarrel with the significance of that principle, but do not find the facts of this case applicable to invoke the statement of law found in *Lovelady.*

■ Situations where a judge has made adverse rulings against an individual or where there has been previous contact between a judge and criminal defendant are not an unusual event in the crowded schedules of trial judges and does not necessarily establish bias. *See State v. Hoeber,* 737 S.W.2d 484, 486 (Mo.App.1987). In *Hoeber,* the trial judge was not presumed prejudiced against the defendant in his trial for driving while intoxicated even though he knew of the defendant's prior plea to the charge of driving while intoxicated and that a revocation hearing on that case was set before the judge immediately following the criminal trial. *Id.* Hoeber argued that the trial judge should have recused himself pursuant to Rule 2, Canon 3(C)(1), claiming plain error for him to preside over his driving while intoxicated trial when he was aware of these additional facts. The court held that the judge would not have presided at the trial if he could not have been impartial. *Id.*

While Judge Roper acquired some knowledge of the injuries sustained by one of the victims, she did not possess "personal knowledge of disputed evidentiary facts concerning the proceeding." Rule 2, Canon

3(C)(1)(a). Missouri courts have consistently held that a judge's prior contacts with the defendant, *Owens*, 759 S.W.2d at 75, or with the underlying proceeding themselves, *Logan v. State*, 712 S.W.2d 9, 10–11 (Mo. App.1986), or with the fact that the court made adverse rulings against the defendant in a prior proceeding, *Owens*, 759 S.W.2d at 75, do not necessitate disqualification.

At the criminal trial, Judge Roper observed first-hand the nature and extent of the victim's injuries, which were generally undisputed and were well documented at trial by Ms. Campbell's testimony, by the plastic surgeon who restored her right eye socket, and by numerous photographs depicting her injuries, which were taken approximately at the same time Judge Roper observed the victim at the domestic hearing. It can hardly be said that the judge had personal knowledge of disputed evidentiary facts concerning the criminal trial which called upon her to disqualify herself. Canon 3(C)(1)(a) did not mandate the judge's self-disqualification because of the knowledge the court acquired in the dissolution hearing of the injuries sustained by one of the victims. The point is denied.

■ The second point defendant raises is the court's error in giving the jury instruction MAI–CR3d 302.04, referred to as the reasonable doubt instruction. Defendant objects to the "firmly convinced" term citing *Cage v. Louisiana*, 498 U.S. 39, 111 S.Ct. 328, 112 L.Ed.2d 339 (1990). The argument is made that the meaning of reasonable doubt is unconstitutionally diminished below that required by due process when a doubt is based upon reason and common sense and "proof that leaves [the trier of fact] firmly convinced of the defendant's guilt." MAI–CR3d 302.04.

The Missouri Supreme Court has held consistently that the *Cage* holding does not "unconstitutionally weaken the State's burden of proof" with regards to the "reasonable doubt" definition set forth in MAI–CR3d 302.04. *State v. Whitfield*, 837 S.W.2d 503, 511 (Mo. banc 1992); *State v. Ervin*, 835 S.W.2d 905, 924 (Mo. banc 1992). Point denied.

■ Finally, the movant claims he was denied effective assistance of counsel in that his trial counsel failed to object to submitting the case to the jury at 10:13 p.m. resulting in a "jury unduly fatigued." The jury began its deliberation at 10:13 p.m. and at 12:50 a.m. sent a note to the judge requesting all of the pictures marked as exhibits. They were sent to the jury room and 30 minutes later, at 1:20 a.m., it returned the verdicts. The jury gave no indication of a problem with their deliberation or the hour. The movant fails to provide the slightest basis to substantiate the allegation that the jury was unduly fatigued. In fact, other than make the allegation, the movant does not argue that the jurors may have been unduly tired, rushed or pressured because of the time of night the case was submitted. The movant had an opportunity at the post-conviction hearing to present evidence of the jury's fatigue but did not do so.

■ The trial court could observe whether the jury was fatigued, and absent evidence that it was unduly tired, or unable to perform their duties, we will not assume a violation of due process. *Moore v. Board of Educ. of Fulton Public School No. 58*, 836 S.W.2d 943, 948 (Mo. banc 1992). In that respect, the motion court found that "[t]he transcript does not show that any jurors complained of fatigue or of the lateness of the hour and [the defendant] failed to produce any evidence which showed they were unable to deliberate fairly." Thus, any objection to the submission of the case at 10:13 p.m. would have been without merit, and an attorney will not be held to have been ineffective for failing to make an objection that lacks merit. *State v. Six*, 805 S.W.2d 159, 168 (Mo. banc 1991), *cert. denied*, ––– U.S. ––––, 112 S.Ct. 206, 116 L.Ed.2d 165 (1991). The point is denied.

Judgment affirmed.

All concur.