WARNER, J.
Appellant challenges his conviction and sentence for four counts of vehicular manslaughter. He makes four claims: (1) that the trial judge erred in failing to recuse himself from the appellant’s criminal case when he was presiding over a civil case involving the deaths of the individuals; (2) that the evidence did not support a finding of criminal negligence; (3) that the verdict was “inconsistent with the weight of the evidence”; and (4) that the court erred in failing to grant a more significant downward departure. As to issue one, appellant’s motion was technically deficient but failed to state a legally sufficient ground for disqualification; as to issue two, we find that the state presented sufficient evidence of defendant’s reckless conduct to survive a motion for judgment of acquittal; and as to issue three, the appellate court has no authority to overturn a verdict simply because it believes that it is inconsistent with the evidence. Finally as to issue four, while the extent of a downward departure generally is not appealable, we find that the trial judge relied upon constitutionally impermissible considerations in determining the extent of the downward departure. We therefore affirm the convictions, but remand for resentencing before a different judge.
Appellant was charged by amended information with four counts of vehicular homicide, arising out of a February 11, 2005, gasoline tanker accident that killed four people: Gloria Halpern, Alan Klein, Deborah Klein, and Anita Epstein. The trial took several days with multiple witnesses, revealing a tragic set of circumstances.
At approximately 10:30 on the night of the incident, appellant was driving a gasoline tanker from 1-595 in Fort Lauderdale onto the northbound entrance ramp to the Florida Turnpike. The tanker contained over 9,000 gallons of fuel. Appellant entered the curving turn of 1-595 onto the turnpike substantially in excess of the 35-mile-per-hour posted speed. Meanwhile, the four victims occupied a white 2001 Mercury, which was traveling ahead of the tanker.
Two lay witnesses, Christina Robinson and Maria Thompson, saw the events leading up to the accident. Ms. Robinson testified that she had driven eastbound on I-595, before exiting to go northbound on the Florida Turnpike. Just prior to entering the northbound ramp, she looked to her left so she could merge to get into the *191 lane for the Turnpike. In her rearview mirror, she saw a smaller white vehicle to her left, one or two car lengths behind her. She also saw “larger white lights behind that white vehicle.” As she approached the ramp, the large white lights came behind her vehicle, getting closer and larger. Ms. Robinson accelerated because the white lights were coming closer, but she was not gaining any distance between her vehicle and the lights. She estimated that while traveling the ramp to the Turnpike entrance, her speed varied from 25 to 40 miles per hour. Ms. Robinson noticed that the large white lights behind her had started merging into the left lane where they began to “wiggle, ‘jiggle like they were losing control almost.” At this point, Ms. Robinson could tell it was a large tanker which was out of control. The front cab started veering to the left, “almost like a jackknifing position.” Ms. Robinson started to slow down and move over “when the front of the cab flipped over on the driver’s side.” As the truck started to lose control, Ms. Robinson saw the smaller white vehicle jam on its brakes and skid.
When Ms. Robinson stopped and got out of her car, she saw that the tanker had flipped over on its side, but she could not see the white vehicle. The truck had caught fire. At first, the fire was self-contained in the rear of the truck, but the flames started to grow, engulfing the entire truck. Gasoline had spilled down the roadway, and both lanes on the ramp became covered in flames. She called 911 and, as she was on the phone, she saw appellant come over the guardrail. She was unable to communicate with him, however, because he spoke Spanish.
Maria Thompson, who was driving home with her six-year-old son, also witnessed the accident. She was exiting 1-595 to go onto the northbound Turnpike. There was not much traffic at the time. She testified that she was driving in the right lane when a tanker truck cut her off as the truck was merging onto the north Turnpike. She hit the brakes and slowed down “because he was going fast” and she did not want to be near him. Her car did not make contact with the tanker. She testified that she was driving about 25 to 30 miles per hour when the tanker cut her off. She could not say how fast the tanker was going, but she explained that it was “more than normal and faster than [she] was going.”
Ms. Thompson saw a white car “way ahead” in the left lane, approximately ten car lengths ahead of her. She saw the tanker swerving back and forth because he was obviously “losing control and trying to get control of it.” The tanker went onto its two left wheels, flipped over on its side, and then skidded. Fluid was spreading and the rear of the truck was on fire, so she backed up to get on the southbound Turnpike, then made a U-turn to head north and proceed back home. As she was passing back by the crash site, there was an explosion and the fire spread onto the Turnpike. She did not stop at the crash site because her son was “extremely scared,” but she later contacted the police.
Appellant lost control of the tanker, which rolled over on its side, slid to a stop, and became engulfed in flames. While not apparently hit by the skidding tanker, the Mercury vehicle skidded and was trapped by the tanker when it came to rest. The tanker caught fire and exploded, engulfing the Mercury in flames. Witnesses saw one individual, Mr. Klein, exit the Mercury in burning clothes. He ran to a nearby retention pond and fell in. The medical examiner found that he had died of drowning but had thermal burns over 65% of his body. The other three occupants of the vehicle died of “conflagration with injuries.”
*192 The state’s accident reconstruction expert, Donald Felieella, testified to his opinion that “[t]he cause of the traffic crash was that the driver of the tanker truck came through that curve at a speed that was too fast to negotiate it. And he was cutting the corner part in the right lane and part off the road. And that his speed is what caused the vehicle to overturn.” Using a mathematical formula, Felieella opined that speed of the tanker at the time of the rollover was 56 to 60 miles per hour.[1] Damage to the white Mercury vehicle was from the heat of the fire. The vehicle did not have significant crush damage, indicating that there was no significant impact with the tanker.
Felieella noted that there was an advisory sign of 35 miles per hour at the beginning of the ramp to the Turnpike, but the posted speed limit was 65 miles per hour. He acknowledged that a driver cannot be issued a speeding ticket for driving in excess of an advisory speed. However, in Felicella’s opinion, a driver of a full gasoline tanker could not safely navigate the entrance ramp’s curve at 65 miles per hour without rolling over.
After the state rested, the defense moved for a judgment of acquittal, arguing that the state failed to establish that appellant operated the vehicle in a reckless manner. The defense argued that this was simply a traffic accident in which speed was a contributing factor, but appellant’s speed alone did not mean his driving was reckless. The trial court denied the motion, concluding that the state had made a prima facie case.
The defense presented its case, consisting of its own accident reconstruction expert, Donald Moore, who differed from Felieella on the calculation of the speed of the tanker. He opined that appellant’s tanker was probably traveling somewhere between 45 and 50 miles per hour at the time of the rollover. Moore calculated a worst-case scenario of 59 miles per hour, but believed that such a figure “probably is a little bit too high.”
After the defense rested and moved again for a judgment of acquittal, the trial court submitted the case to the jury. Against the recommendation of counsel, appellant refused jury instructions on any lesser-included offenses. After deliberations, the jury found appellant guilty of four counts of vehicular homicide as charged in the information.
The minimum guidelines sentence was 37 years, and the maximum was life in prison. The defense moved for a downward departure on the ground that the incident was “committed in an unsophisticated manner and was an isolated incident for which the defendant has shown remorse.” The court pronounced a sentence of 36 years, downwardly departing by only a year. This appeal follows.
On appeal, appellant argues that the trial court erred in denying his motion to disqualify Judge Streitfeld. Judge Streit-feld was presiding over a civil case involving the incident. Because the judge’s docket was cleared during the week that the ci'iminal trial was set, he volunteered to help the assigned judge by taking the criminal case, as he already had familiarity with the case. Although not objecting at first, appellant later filed an “Objection to Case Reassignment,” objecting to Judge Streitfeld presiding in the criminal case, as he had already made a legal determination in the civil case that there was sufficient negligence to permit the plaintiff to plead a claim for punitive damages. Because the issue of the degree of appellant’s negli *193 gence would also be raised in a motion for judgment of acquittal in the criminal trial, appellant argues that Judge Streitfeld should have disqualified himself. We find, however, that the motion was technically insufficient at the time it was presented. Even if it were sufficient, we conclude that the issue raised did not require disqualification.
The standard of review of the denial of a motion to disqualify is de novo. Edwards v. State, 976 So.2d 1177, 1178 (Fla. 4th DCA 2008). A motion to disqualify is governed by the procedural requirements of Florida Rule of Judicial Administration 2.330. One of the technical requirements of the rule is that a motion to disqualify shall “be sworn to by the party signing the motion under oath or by a separate affidavit.” Fla. R. Jud. Admin. 2.330(c)(3). Additionally, the “attorney for the party shall also separately certify that the motion and the client’s statements are made in good faith.” Fla. R. Jud. Admin. 2.330(c). If the technical requirements of the motion are not met, the motion is legally insufficient. See Barnhill v. State, 834 So.2d 836, 843 (Fla.2002) (holding that regardless of whether the judge’s commentary otherwise warranted disqualification, “the technical requirements of the motion were not met and the trial court’s decision to deny the motion as legally insufficient was proper”). Thus, failure to support a motion for disqualification with the client’s sworn signature or an affidavit is a basis to deny the motion. Wal-Mart Stores, Inc. v. Carter, 768 So.2d 21, 22 (Fla. 1st DCA 2000); Gaines v. State, 722 So.2d 256, 256 (Fla. 5th DCA 1998).
Here, the trial court properly denied appellant’s motion because the motion did not comply with the procedural requirements of rule 2.330. The motion for disqualification was not supported by appellant’s sworn signature, nor was it supported by any affidavit. Further, defense counsel did not separately certify that the motion and the client’s statements were made in good faith. For these technical reasons alone, the trial court did not err in denying the motion as legally insufficient.
While appellant acknowledges that his motion was technically deficient because it failed to include the required verification, he maintains that he was not given the opportunity to swear to the motion in light of the trial court’s “haste” to summarily deny the motion. However, this contention is not borne out by the record. When the written motion was presented to the trial court, defense counsel noted that he had already prepared and filed the motion and was presenting it to the trial court for a ruling. Thus, the failure to comply with the technical requirements of the rule cannot somehow be attributed to the trial court.
Apart from the technical requirements of the rule, the substantive test for whether a motion to disqualify is “legally sufficient” is whether the facts alleged would place a reasonably prudent person in fear of not receiving a fair and impartial trial. See Livingston v. State, 441 So.2d 1083, 1087 (Fla.1983); Zuchel v. State, 824 So.2d 1044, 1046 (Fla. 4th DCA 2002); Hayslip v. Douglas, 400 So.2d 553, 556 (Fla. 4th DCA 1981); see also Florida Code of Judicial Conduct, Canon 3E(1) (providing that “[a] judge shall disqualify himself or herself in a proceeding in which the judge’s impartiality might reasonably be questioned”).[2]
*194 Accordingly, the rule states that “[a] motion to disqualify shall show ... that the party fears that he or she will not receive a fair trial or hearing because of specifically described prejudice or bias of the judge.” Fla. R. Jud. Admin. 2.330(d)(1). In determining the legal sufficiency of the motion, “[i]t is not a question of what the judge feels, but the feeling in the mind of the party seeking to disqualify and the basis for that feeling.” Corie v. City of Riviera Beach, 954 So.2d 68, 70 (Fla. 4th DCA 2007). Nonetheless, the fear of judicial bias must be objectively reasonable. Foy v. State, 818 So.2d 704, 706 (Fla. 5th DCA 2002).
The facts and reasons given for the disqualification must tend to show personal bias or prejudice. Levine v. State, 650 So.2d 666, 667 (Fla. 4th DCA 1995). The fact that the judge has made adverse rulings against the defendant in the past is not an adequate ground for recusal, nor is the mere fact that the judge has previously heard the evidence. Mansfield v. State, 911 So.2d 1160, 1171 (Fla.2005); Chamberlain v. State, 881 So.2d 1087, 1097 (Fla.2004). Moreover, a judge is not disqualified from presiding over a criminal trial because the judge presided over civil proceedings involving the defendant, even where the civil proceedings arise out of the same incident as the criminal proceedings. See, e.g., State v. Tanner, 224 La. 374, 378, 69 So.2d 505, 507 (1953); Adams v. State, 220 Miss. 812, 816-17, 72 So.2d 211, 213-14 (1954); State v. Reeter, 848 S.W.2d 560, 564 (Mo.Ct.App.1993); King v. State, 216 Tenn. 215, 226, 391 S.W.2d 637, 643 (1965). Likewise, in the context of a probation revocation proceeding, the Fifth District held that the defendant’s motion to disqualify the trial judge was legally insufficient where the same judge was presiding over his dependency case, and the defendant did not allege that the judge made any comments or rulings suggesting bias in that case. See Scott v. State, 909 So.2d 364, 367-68 (Fla. 5th DCA 2005).
Appellant failed to allege any objectively reasonable fear of judicial bias. The mere fact that Judge Streitfeld made an adverse ruling in a related civil case on a threshold issue of whether the plaintiff in that case could plead a claim for punitive damages did not demonstrate that the judge was personally biased or prejudiced against appellant. Instead, the trial judge’s ruling in the civil case was merely the exercise of a legitimate judicial function. Thus, appellant’s motion to reassign the case was properly denied as legally insufficient.
In his second issue, appellant claims that the evidence at trial showed, at best, only excess speed as causing the accident, which is legally insufficient to show that he drove with a willful and wanton disregard of safety that rose to the level of criminal culpability. The state argues that appellant’s conduct involved much more than merely speed in that he was driving a large tanker filled with highly combustible material and was veering in and out of traffic. We agree with the state that the evidence was sufficient to avoid a motion for judgment of acquittal.
A de novo standard of review applies when reviewing a motion for judgment of acquittal. Pagan v. State, 830 So.2d 792, 803 (Fla.2002). In moving for a judgment of acquittal, a defendant admits the facts in evidence and every conclusion favorable to the state that may be reasonably inferred from the evidence. Turner v. State, 29 So.3d 361, 364 (Fla. 4th DCA 2010). A court should grant a motion for judgment of acquittal only if “the evidence is such that no view which the jury may lawfully take of it favorable to the opposite party can be sustained under the law.” *195 Lynch v. State, 293 So.2d 44, 45 (Fla.1974). Where there is room for a difference of opinion between reasonable minds as to the proof or facts from which an ultimate fact is sought to be established, or where there is room for such differences as to the inferences which might be drawn from conceded facts, the trial court should submit the case to the jury. Id. “If, after viewing the evidence in the light most favorable to the State, a rational trier of fact could find the existence of the elements of the crime beyond a reasonable doubt, sufficient evidence exists to sustain a conviction.” Pagan, 830 So.2d at 803 (citations omitted).
The crime of vehicular homicide is defined as the killing of a human being “caused by the operation of a motor vehicle by another in a reckless manner likely to cause the death of, or great bodily harm to, another.” § 782.071, Fla. Stat. (2004). The degree of culpability required for vehicular homicide is less than the level of culpable negligence necessary to prove manslaughter, but more than a mere failure to use ordinary care. McCreary v. State, 371 So.2d 1024, 1026 (Fla.1979). Vehicular homicide cannot be proven without also proving the elements of reckless driving, which requires proof of a “willful or wanton disregard for the safety of persons or property.” See State v. Del Rio, 854 So.2d 692, 693 (Fla. 2d DCA 2003); § 316.192(1), Fla. Stat.
In determining whether a defendant was driving recklessly, the essential inquiry is whether the defendant knowingly drove the vehicle in such a manner and under such conditions as was likely to cause death or great bodily harm. D.E. v. State, 904 So.2d 558, 562 (Fla. 5th DCA 2005). Although the defendant need not have foreseen the specific circumstances causing the death of the victim, the defendant should have reasonably foreseen that the same general type of harm might occur if he knowingly drove his vehicle under circumstances that would likely cause death or great bodily harm to another. Michel v. State, 752 So.2d 6, 12 (Fla. 5th DCA 2000).
A number of appellate courts in Florida have stated that “speed alone” is insufficient to support a conviction for vehicular homicide.[3] See, e.g., House v. State, 831 So.2d 1230, 1233 (Fla. 2d DCA 2002) (holding that evidence was insufficient to support conviction for vehicular homicide where the defendant was driving 60 miles per hour in a 30 mile per hour zone before the collision and a minimum of 50 miles per hour at the time of impact); Hamilton v. State, 439 So.2d 238, 238-39 (Fla. 2d DCA 1983) (holding that speed alone will not support a conviction, but that other factors supported the vehicular homicide conviction where defendant was speeding at 50 to 60 miles per hour in a 30 mile per hour residential area with “SLOW-CHILDREN PLAYING” sign). This court, however, has held that grossly excessive speed alone can constitute reckless conduct. See Pozo v. State, 963 So.2d 831, 833-34 (Fla. 4th DCA 2007) (holding that evidence was sufficient to support conviction for vehicular homicide where defendant was driving anywhere from 67 to 90 miles per hour in a residential neighbor *196 hood, which alone justified denial of the motion for judgment of acquittal, even though the defendant was also playing with his CD, driving in rainy conditions, and rounding a curve in the road); see also Copertino v. State, 726 So.2d 330, 332-34 (Fla. 4th DCA 1999).
Taking the evidence in the light most favorable to the state, appellant was driving a gasoline tanker filled with 9,000 gallons of fuel at 56 to 60 miles per hour around a curving highway ramp with an advisory speed of 35 miles per hour and with other vehicles nearby. He was weaving and cut off at least one other driver, approached and overtook another driver, forcing her to change lanes quickly. As the trial court noted at sentencing:
Well, actually what occurred is he cut off one person, swerved, came up behind another car and then lost control of his vehicle. As far as pattern of recklessness, it involved more than one vehicle. Unfortunately the vehicle involving this family was in the wrong place at the wrong time.... It wasn’t just the speed. It was the whole method in which he was driving at the time.
We conclude that the state’s evidence was sufficient to show that the defendant should have reasonably foreseen that driving his tanker fully loaded with highly combustible fuel into a curve at such speeds as would likely cause him to lose control of his vehicle and cause it to overturn, would involve serious injury to himself, if not others. That others lost their lives was indeed a foreseeable and tragic occurrence. The trial court did not err in denying the motion for judgment of acquittal.
Appellant also suggests that the verdict was contrary to the weight of the evidence, but an appellate court has no authority to reverse a conviction on the ground that the verdict is contrary to the weight of the evidence. Robinson v. State, 462 So.2d 471, 476-77 (Fla. 1st DCA 1984); see also Tibbs v. State, 397 So.2d 1120 (Fla.1981). Rather, an appellate court concerns itself only with the legal sufficiency of the evidence. Toliver v. State, 953 So.2d 713, 715 (Fla. 1st DCA 2007). This issue is without merit.
Finally, appellant claims that the court erred in downwardly departing by only one year where the evidence showed that this was an isolated incident committed in an unsophisticated manner for which the appellant had shown remorse. However, appellant also complains that the trial judge improperly used religious considerations in determining the sentence. Under the unique facts of this case, we conclude that the trial judge relied upon constitutionally impermissible considerations in determining the extent of the downward departure.
A trial court’s decision to grant a downward departure is a two-step process. State v. Alonso, 31 So.3d 265, 266 (Fla. 4th DCA 2010). “First, the court must determine whether it can depart, i.e., whether there is a valid legal ground and adequate factual support for that ground in the case pending before it (step 1).” Banks v. State, 732 So.2d 1065, 1067 (Fla.1999) (emphasis in original). Second, where the requirements of the first step are met, the trial court “must determine whether it should depart, i.e., whether departure is indeed the best sentencing option for the defendant in the pending case.” Id. at 1068 (emphasis in original). If a trial court grants a downward departure, an appellate court does not have the power under the current statutory scheme to review the extent of the downward departure. See § 921.0026(1), Fla. Stat. (2008) (“The imposition of a sentence below the lowest permissible sentence is sub *197 ject to appellate review under chapter 924, but the extent of downward departure is not subject to appellate review.”).
At sentencing, the defense moved for a downward departure on the ground that the offense was “committed in an unsophisticated manner and was an isolated incident for which the defendant has shown remorse,” a statutory ground for seeking a downward departure. See § 921.0026(2)(j), Fla. Stat. Although the court seemed unimpressed with the appellant’s statements of remorse, the court still downward departed but only by a year from the minimum guidelines sentence permitted. In pronouncing sentencing, the judge relied on a religious concept in determining the sentence. The court said:
Now, no number of years will bring back four extraordinary people or the scars that have been created as a result of what happened to those four extraordinary people.

In the Jewish tradition there is a concept [of chai it’s 18] that stands for life which is something I wish to be mindful of in imposing a sentence over the loss of life of four Jewish people.

[4]

[[Image here]]
I accept that you are a good friend, are a loving husband, and will prove to be a good father to your child as you have another child I understand. It is my sentence to downward depart by one year and impose a sentence of [double chai] 36 years, Florida state prison.[5]
While the appellant argues that the trial court abused its discretion in consideration of Jewish tradition and the use of chai, discretion is not involved. The essence of his claim, albeit obliquely made, is that the court used improper criteria in determining the extent of a downward departure.
Although an appellate court generally may not review a sentence that is within statutory limits, an exception exists when the trial court considers constitutionally impermissible factors in imposing a sentence. Nawaz v. State, 28 So.3d 122, 124 (Fla. 1st DCA 2010). Reliance on constitutionally impermissible factors is a violation of a defendant’s due process rights. See Ritter v. State, 885 So.2d 413, 414 (Fla. 1st DCA 2004); see also Holton v. State, 573 So.2d 284, 292 (Fla.1990). Examples of factors that are constitutionally impermissible or totally irrelevant to the sentencing process include the race, religion or political affiliation of the defendant. See Zant v. Stephens, 462 U.S. 862, 885, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983). “[S]imilar principles apply when a judge impermissibly takes his own religious characteristics into account in sentencing.” United States v. Bakker, 925 F.2d 728, 740 (4th Cir.1991) (holding that judge violated due process by stating at sentencing that “those of us who do have a religion are ridiculed as being saps from money-grubbing preachers or priests”); see also Singleton v. State, 783 So.2d 970, 979 (Fla.2001) (holding that biblical references should not be used at sentencing, but any error in the trial judge’s lone biblical reference in penalty phase of trial was harmless where jury was not exposed to the reference and the court’s order stated that it did not consider any aggravators other than the two set forth in the order).
*198 In Nawaz, 28 So.3d at 125, the trial court was sentencing the appellant for soliciting a minor to engage in an unlawful act. In speaking to the defendant, the trial court accused him of being a degenerate, and the court commented on the appellant’s statement in his presentence interview that he thanked God that he had married a woman from his own country, Pakistan, and not an American woman. The court said, “I join you in thanking God you did not marry an American woman.” Raising the issue for the first time on appeal, the appellant argued that the court improperly took into account his national origin in imposing sentence. The First District found that because such an error was a defect in the sentencing process, it could review the issue as a fundamental error. Noting that national origin was a constitutionally impermissible factor where it becomes a basis for determining the sentence, the court found that the comments of the trial court “could reasonably be construed to suggest that the trial judge based appellant’s sentence, at least in part, on his national origin.” The court concluded:
We are further mindful of the mandate that, for justice to be done, it must also appear to be done. See, e.g., Scott v. Anderson, 405 So.2d 228, 234 (Fla. 1st DCA 1981) (“[T]o perform its high function in the best way ‘justice must satisfy the appearance of justice.’ ”) (quoting In re Murchison, 349 U.S. 133, 136, 75 S.Ct. 623, 99 L.Ed. 942 (1955)). Because it is unclear whether the trial court would have imposed the same sentence absent consideration of appellant’s national origin, we must vacate appellant’s sentence and remand for resen-tencing before a different judge.
Id. at 125 (emphasis in original).
If we were to substitute “religion” for “national origin,” the Nawaz case is on “all fours” with this case, except that here, the religious concept formed the very basis of calculating the sentence, not just a part. To establish the length of sentence based upon specific religious principles infuses it with a factor which is constitutionally impermissible. Having found a valid ground for departure, the court nevertheless made what was essentially an insignificant departure to bring the sentence within a religious precept. We cannot say that the sentence would be the same without reliance on the impermissible ground.
We therefore must vacate the appellant’s sentence and remand for resentenc-ing before a different judge. We acknowledge that this will cause pain to the families of the victims, which we much regret; nevertheless, the consideration of constitutionally impermissible factors in sentencing compels this result.
For the foregoing reasons, we affirm the conviction, vacate the sentence, and remand for resentencing before a different judge.
TAYLOR and LEVINE, JJ., concur.

. Using a separate "slide-to-stop” calculation, which gives a minimum speed at the time of rollover, Felieella calculated a minimum speed of 52 to 62 miles per hour.

. Under this canon, a judge is disqualified whenever the judge’s impartiality might reasonably be questioned, regardless of whether any of the specific rules in Section 3E(1) apply. See Commentary to Florida Code of Judicial Conduct Canon 3E(1).

. By contrast, the Fifth District in dicta has expressed skepticism about the maxim that "speed alone is not enough,” but the court found it unnecessary to reach the question. See State v. Lebron, 954 So.2d 52, 55 (Fla. 5th DCA 2007) ("This court, however, has never directly said that speed alone is not enough. When confronted with the issue, we, as most other appellate courts of this state, have found that speed was not alone in what amounted to reckless driving. Perhaps it is because excessive speed for the prevailing conditions is rarely without other circumstances.”).

. The bracketed portion is not in the written transcript. However, the appellant’s brief included the reference to chai. Later, this court was provided with a DVD with the sentencing proceeding where the court clearly uses the term. The state does not contest that the judge said these comments. It is disturbing to this court that the official transcript does not contain all of what the court said on such an important part of the record.

. The use of the double chai was also on the DVD of the sentencing proceeding but not in the official transcript.