GROSS, J.
In this tragic case, Abigail Damoah drove a car that crashed at the northbound 1-95 exit ramp heading onto eastbound Commercial Boulevard in Fort Lauder-dale. , The crash caused the death of her boyfriend. Damoah was convicted of vehicular homicide and sentenced to twelve years in prison.

The State’s Case

No witness at trial described how the accident occurred. On the night of the incident, witness Rolla was heading west on Commercial Boulevard when he saw a car plowed into a tree. The vehicle faced *318 east,, but was on the westbound side of the road. Rolla pulled over and called 911. He approached the car and saw a male in the passenger seat who appeared to be unconscious. He described a hysterical female in the driver’s seat.
A police officer was dispatched to the scene. He observed a black Volvo on the westbound -side of the road in the grass, facing east, with heavy front-end damage. On the south side of the road, near the exit from 1-95, there was a power utility pole resting on the ground and a 61-foot--long skid mark. The skid mark began in the exit ramp before the ramp started to curve to the east. From the physical evidence on the roadway, the officer determined that the Volvo came off the 1-95 exit ramp to eastbound Commercial Boulevard; the car knocked over the utility pole, crossed the eastbound lanes, hit the curb of the center median, went airborne, and came to rest on the westbound side of Commercial Boulevard.
The speed limit on 1-95 was 65 mph, marked every mile. A “critical speed” is the speed at which a vehicle can safely take a radius or a curved roadway.' The critical speed of the J-curve on the exit ramp was 41.41 mph. Exceeding this speed while trying to navigate the curve would typically cause the driver of a vehicle to lose control. The minimum speed of the Volvo at the start of the skid mark was between 79 and 81 mph.
This was not the typical exit ramp on the interstate, which begins to curve a short distance from the highway. There were four lanes on the exit ramp, three that continued on and one that veered right, towards the east. Ordinarily, well in advance of where the Volvo began to skid, there,- would have been signs on the exit ramp, to alert a driver of the sharp curve. However, on the date of the incident, the exit ramp was technically a Department of Transportation construction zone, even though no construction machinery or barriers were present. Construction had been finished and the roadway repaved, but the Department had not yet given its final approval. As a result, no speed limit signs were posted.

The Defense Case

Damoah testified at trial. Originally from England, she came to Florida to pursue her post-graduate degree. She had been dating the deceased for about 6 months prior to the crash. On the night of the 'incident, the deceased called Damoah .at approximately 10 p.m. and told her he was coming over to her apartment.- He arrived around 11 p.m., and once there, drank a couple of beers. Damoah had only two mouthfuls ,of beer that night. She did not plan to drink because she had to complete her dissertation the following week.
Later in tlie evening, the deceased took .Damoah to a Miami nightclub. He continued to drink, at the nightclub. Damoah described the deceased’s behavior at the nightclub as unusual; he was overly affectionate with her, which was unlike him. They stayed at the club until approximately 5:00 or 6:00 a.m. The deceased was extremely drunk when they left the club. Damoah did not think she should get in the Volvo with the deceased, but had no other way of getting home. He assured her he would get her home safely.
The deceased’s driving was erratic. At one point, Damoah looked at the speedometer, which indicated a speed of 130 mph. She asked him to slow down, but he refused, telling her that there was an emergency at home. Sometime later, the deceased said he was not feeling well, and pulled the vehicle over, onto the shoulder of the interstate. Damoah looked over and saw the deceased’s eyes roll toward the back of his head.
*319 Damoah got out of the vehicle and the deceased slid over into the front passenger seat. She got into the driver’s seat,, fastened her, seatbelt, and told him to do the same. He refused. Damoah had little experience driving in the United States and she was not familiar with driving on I-95 in Broward County. She had never driven the deceased’s Volvo. A short while after Damoah began driving, the deceased leaned forward, screamed “no,” and flailed his hands around/ She looked over at him- to ask if he was okay, and when she turned to put her eyes back on the road, “the road suddenly started to curve to the left and [she] slammed the brakes on, immediately and [did not] remember anything that happened after that.”
The state challenged Damoah’s familiarity with the area, and her testimony that she did not realize she had taken the exit ramp. Taking Commercial Boulevard eastbound from 1-95 would be consistent with heading toward Damoah’s home.
.The state: Yet, you proceeded to' exit Commercial, to head eastbound towards your house, the direction towards your house; correct?
Damoah: I didn’t realize that I had taken the exit ramp at that-point. It wasn’t until I got the discovery that I was made aware that I had entered into an exit ramp.
Damoah’s description of the deceased’s behavior was consistent with a chemical analysis of his blood — both Ecstasy and alcohol were in his system; He had a blood alcohol content of .24 at the time of his death. Damoah’s blood alcohol content was .01, below the legal limit of .08.

Motions, Verdict, and Sentence

Damoah twice moved for a judgment of acquittal, after the state rested and again after she testified. She argued that excessive speed, without more, is insufficient to establish a Vehicular homicide. She requested a special jury instruction on the vehicular homicide charge that defined “reckless manner.” The trial court denied the special instruction, opting to stick with the standard instruction.
The jury found Damoah. guilty of vehicular homicide. . The trial court sentenced her to 12 years in' the Department of Corrections, followed by 3 years of probation. Damoah had no prior criminal record.[1]

Discussion

The law differentiates between-negligent driving conduct, which exposes a wrongdoer to civil liability, • and criminal" driving conduct, which subjects a person to incarceration and other criminal sanctions. Case law strictly construes criminal driving statutes to prevent the net of the criminal law from sweeping so broadly that it snares all conduct, both criminal and negligent. The lenity principle codified at section 775.021(l)-(2), Florida . Statutes (2014), requires criminal statutes to be strictly construed in the accused’s favor. See State v. Byars, 823 So.2d 740, 742 (Fla.2002); McGhee v. State, 847 So.2d 498, 503 (Fla. 4th DCA2003).
*320 Part of the rationale for this approach is historical, deriving from common law crimes, where there was “the ancient requirement of a culpable state of mind.” Morissette v. United States, 342 U.S. 246, 250, 72 S.Ct. 240, 96 L.Ed. 288 (1952). To blur the line between mere negligence and criminal intent would, borrowing Justice Jackson’s "words, “ease the prosecution’s path to conviction, [] strip the defendant of such benefit as he derived at common law from innocence of evil purpose, and [ ] circumscribe the freedom heretofore allowed juries.” Id. at 263, 72 S.Ct. 240.
Consistent with this view, the Florida Supreme Court has held “statutes criminalizing simple negligence to be unconstitutional.” State v. Smith, 638 So.2d 509, 510 (Fla.1994). “[Ujnintentional conduct [] not generated by culpable negligence” will not support criminal liability. State v. Hamilton, 388 So.2d 561, 563 (Fla.1980); see also State v. Winters, 346 So.2d 991, 994 (Fla.1977).
Case law applying the statute at issue here preserves the distinction between negligence and criminal conduct.
“ ‘Vehicular homicide’ is the killing of a human being ... caused by the operation of a motor vehicle by another in a reckless manner likely to cause death of, or great bodily harm to, another.” § 782.071, Fla. Stat. (2014). “The degree of culpability required for vehicular homicide is less than that necessary to prove manslaughter, but it is more than a mere failure to use ordinary care.” Stracar v. State, 126 So.3d 379, 381 (Fla. 4th DCA 2013). “Vehicular homicide cannot be proven without also proving the elements of reckless driving, which requires proof of a ‘willful or wanton disregard for the safety of persons or property.’ ” Santisteban v. State, 72 So.3d 187, 195 (Fla. 4th DCA 2011) (quoting § 316.192(1)(a), Fla. Stat.). “ ‘Willful’ means ‘intentional, knowing, and purposeful,’ and ‘wanton’ means with a ‘conscious and intentional indifference to consequences and with knowledge that damage is likely to be done to persons or property.’ ” Lewek v. State, 702 So.2d 527, 530-31 (Fla. 4th DCA 1997) (quoting Fla. Std. Jury Instr. (Crim.)).
“In determining whether a defendant was driving recklessly, the essential inquiry is whether the defendant knowingly drove the vehicle in such a manner and under such conditions as was likely to cause death or great bodily harm.” Santisteban, 72 So.3d at 195.
Although the defendant need not have foreseen the specific circumstances causing the death of the victim, the defendant should have reasonably foreseen that the same general type of harm might occur if he knowingly drove his vehicle under circumstances that would likely cause death or great bodily harm to another.
Id. “Speed alone does not constitute reckless conduct unless the speed is shown to be grossly excessive.” Rubinger v. State, 98 So.3d 659, 662 (Fla. 4th DCA 2012).
In cases affirming convictions for vehicular homicide or manslaughter by culpable negligence, it is excessive speed, in combination with other factors, that support the convictions. For example, in Copertino v. State, the defendant was driving 90.41 mph in a residential area in a Honda Civic packed with nine persons, “7 of whom were crammed into the back seat without seatbelts.” 726 So.2d 330, 333 (Fla. 4th DCA 1999). We held that these facts evinced “the required reckless disregard for human life or the consequences on the safety of his passengers” contemplated by the manslaughter statute. Id.
Similarly, in Pozo v. State, the defendant was looking for a compact disc when driving anywhere from 67-90 mph in a resi *321 dential neighborhood, while heading into a rain shower. 963 So.2d 831, 833-34 (Fla. 4th DCA 2007). We held these facts to be sufficient to withstand a motion for judgment of acquittal. Id. at 834. Recently, this Court affirmed the denial of the defendant’s motion for judgment of acquittal on a vehicular homicide charge. Opsincs v. State, 185 So.3d 654 (Fla. 4th DCA 2016). “The State’s expert testified that the speed limit was 50 mph and that appellant’s speed was 69 mph at the time of impact. The roads were wet from the rain earlier in the day.”. Id. at 657. Moreover, “[i]m-mediately before the accident, appellant swerved through traffic, rapidly approached the traffic light while looking down and without braking, and ran a light that had been red for nine seconds before impact.” Id.
And in Lewek v. State, the defendant was traveling 60 mph on a residential road with a 45 mph speed limit, in a car with unsafe equipment, and he ran a red light that had been red for five seconds. 702 So.2d at 531. We held these facts sufficient to support two vehicular homicide convictions. Id.; see also Santisteban, 72 So.3d at 196 (vehicular manslaughter conviction affirmed where driver of a gasolinó tanker filled with 9,000 gallons of fuel went 56-60 mph on a curving highway ramp with an advisory speed of 35 mph, while weaving and cutting off other drivers).
It is well settled that, when reviewing the denial' of a motion for a judgment of acquittal, the appellate court must consider the evidence and all reasonable inferences from the evidence in a light most favorable to the state. See, e.g., Parker v. State, 795 So.2d 1096, 1098 (Fla. 4th DCA 2001). Here, other than the testimony about the speed of the Volvo at the beginning of the skid mark, there was no other evidence that supported the conviction. This was not a residential neighborhood; it was- an exit ramp from an interstate highway. Damoah’s blood alcohol level was well below the legal limit. There was no evidence of other drugs in her system. There was no description of erratic driving' conduct before the skid began. There was no evidence of inclement weather conditions. There were only two occupants in the car. The Volvo’s approximate speed was 14-16 mph over the highway speed limit. Because the ramp had recently been repaved, there were neither recommended speed signs nor warning signs about the curve in the’ exit ramp. While sufficient for a finding of simple negligence, these facts do not amount to the operation of a motor vehicle in a reckless manner likely to cause the death of, or great bodily harm to, another. The circuit court erred in not granting the motion for judgment of acquittal on the vehicular homicide charge.
This case most resembles Stracar v. State, 126 So.3d 379 (Fla. 4th DCA 2013). There, this- Court reversed convictions for two counts of vehicular homicide after finding that the state failed to show that the defendant" was driving in a reckless manner. Id. at 380. In denying Straear’s motions for judgment of acquittal, the trial court detailed the facts of the case:
The evidence at trial was that the Defendant [Stracar] was driving a vehicle which left the roadway, traveled along a sidewalk and a grassy area, crossed a divided roadway and hit a sign which launched the car over a median of the intersecting street and land[ed] on the victims [sic] car crushing the two occupants. Ms. Stracar traveled ... for over 500 feet at approximately 40 miles per hour. She suffered no serious injuries and was found conscious in her vehicle at the scene. She had to be removed through the roof due to crash damage.
*322 Id. “There was no evidence of any braking or other'attempt by appellant to avoid the crash, nor were there any curves in the roadway which would have contributed to appellant losing control of her vehicle.” Id. at 380-81. Moreover, at , the time of the incident, “the weather conditions were optimal and the pavement was dry.” Id. at 381. Three hours after the accident, Stracar’s blood test results indicated a blood alcohol level of “less than .02%, THC from marijuana use at some undetermined time, oxycodone at a potentially therapeutic level, and Xanax within therapeutic levels.” Id. There was no evidence of unsafe or erratic driving prior to the accident. Id.
This Court held that “appellant’s actions, while certainly negligent, did not rise to the level of recklessness sufficient to sustain the convictions for vehicular homicide.” Id.
[W]hat was missing from the State’s proof in this case is evidence that the appellant, in an intentional, knowing and purposeful manner, was driving at the time of the incident in a manner demonstrating a conscious and intentional indifference to consequences and with knowledge that damage is likely to be done to persons or property.
Id. at 382.
In this case, the evidence was also insufficient to support the lesser included offenses of reckless driving and culpable negligence. Vehicular homicide “cannot be proven without also proving the elements of reckless driving, which requires proof of a ‘willful or wanton disregard for the safety of persons or property.’ ” Santisteban, 72 So.3d at 195 (quoting § 316.192(l)(a), Fla. Stat.). Culpable negligence
is more than a failure to use ordinary care for others. In order for negligence to be culpable, it must be gross and flagrant. Culpable negligence ' is a course of conduct showing reckless disregard for human life, or for the safety of persons exposed to its dangerous effects, or such an entire want of care as to raise a presumption of a conscious indifference to consequences, or which shows wantonness or recklessness, or a grossly careless disregard for the safety and welfare of the public, or shows such an indifference to the rights of others as is equivalent to an intentional violation of such rights.
Fla. Std. Jury Instr. (Crim.) 8.9. For the same reasons the state’s case failed to support Damoah’s conviction of vehicular homicide, the evidence does not support convictions for reckless driving or culpable negligence.
For these reasons, we reverse the conviction for vehicular homicide and remand to the circuit court with directions to enter a judgment of acquittal and discharge Damoah.[2]
DAMOORGIAN and KLINGENSMITH, JJ., concur.

. On Damoah’s criminal punishment code scoresheet, vehicular homicide is. a level 7 offense that scored 56 points. For the death of the victim, 120 points was added. The 176-point total indicated a lowest permissible sentence of 9.25 years and a maximum sentence of 15 years. Damoah requested a downward departure on the basis that the offense was committed-in an unsophisticated manner and was an isolated incident for which she had shown remorse. The state asked for the maximum sentence of 15 years. The trial judge agreed with the state that a downward departure was not appropriate. She indicated that the crime was not committed in an unsophisticated manner, noting the speed of 80 mph on an exit ramp. The judge was also not convinced that Damoah’s remorse was "completely heartfelt.”

. We do not reach the issue of whether the trial court erred in refusing Damoah’s request for a special instruction that defined "reckless manner,” part of the standard instruction for vehicular homicide. We note thát the standard jury instruction was amended in'2015 to include almost verbatim the special instruction requested by Damoah in this case. The new standard, instruction removes "An intent by the defendant to harm or injure the victim or any other person is not an element to be proved tiy the State,” and replaces it with:
The State does not have to prove the defendant intended :to harm or.injure anyone. *323 However, the reckless operation of a [motor vehicle] requires the State to prove more than a mere failure to use ordinary care. A "reckless manner” means in willful or wanton disregard for the safety of persons or ■property.
In re Standard Jury Instructions in Criminal Cases-Report No. 2014-08, 176 So.3d 938, 940 (Fla.2015) (Mem).