GROSS, J.,
concurring specially.
I concur in the majority’s decision because current Florida law gives a sentencing judge unlimited discretion to sentence a defendant up to the maximum term set by the legislature for a particular crime. Also, the last time the Florida Supreme Court considered a cruel or unusual punishment challenge to a sentence, the court rejected it. See Hall v. State, 823 So.2d 757, 760-61 (Fla.2002) (finding that the Florida Criminal Punishment Code did not violate federal or state constitutional guarantees against cruel or unusual punishment). However, Hall was decided prior to Graham v. Florida, 560 U.S. 48, 130 S.Ct. 2011, 176 L.Ed.2d 825 (2010), Miller v. Alabama, — U.S. —, 132 S.Ct. 2455, 183 L.Ed.2d 407 (2012), and Adaway v. State, 902 So.2d 746 (Fla.2005). An evolving concept of the type of punishment that is cruel or unusual compels the conclusion that the sentence in this case violates the Florida and United States Constitutions. Fairness, justice, and due process dictate that the sentence be reversed and the case remanded for resentencing.

Brief Historical Review of Sentencing in Florida

Criminal sentencing in Florida has come full circle in 40 years. Prior to the imposition of sentencing guidelines, other than the maximum term of years provided by statute and the occasional mandatory minimum, there were few restrictions on a judge’s sentencing decision. One of the purposes of the 1983 adoption of the sentencing guidelines was “ ‘to establish a uniform set of standards to guide the sentencing judge’ and ‘to eliminate unwarranted variation'in the sentencing process by reducing the subjectivity in interpreting specific offense and offender-related criteria and in defining their relative importance in the sentencing decision.’” Santiago v. *947 State, 478 So.2d 47, 48 (Fla.1985) (quoting In re Rules of Crim. Proc. (Sent’g Guidelines ), 439 So.2d 848, 849 (Fla.1983)); accord Alan C. Sundberg et al., A Proposal for Sentence Reform in Florida, 8F La. St. U.L.Rev. 1 (1980) [hereinafter Sundberg], The principles embodied by the sentencing guidelines were:
1. Sentencing should be neutral with respect to race, gender, and social and economic status.
2. The primary purpose of sentencing is to punish the offender. Rehabilitation and other traditional considerations continue to be desired goals of the criminal justice system but must assume a subordinate role.
3. The penalty imposed should be commensurate with the severity of the convicted offense and the circumstances surrounding the offense.
4. The severity of the sanction should increase with the length and nature of the offender’s criminal history.
5. The sentence imposed by the sentencing judge should reflect the length of time to be served, shortened only by the application of gain time.
6. While the sentencing guidelines are designed to aid the judge in the sentencing decision and are not intended to usurp judicial discretion, departures from the presumptive sentences established in the guidelines shall be articulated in writing and made only for clear and convincing reasons.
7. Because the capacities of state and local correctional facilities are finite, use of incarcerative sanctions should be limited to those persons convicted of more serious offenses or those who have longer criminal histories. To ensure such usage of finite resources, sanctions used in sentencing convicted felons should be the least restrictive necessary to achieve the purposes of the sentence.
In re Rules of Crim. Proc. (Sent’g Guidelines ), 439 So.2d at 849. The effect of the guidelines was to enhance sentencing neutrality and reduce subjectivity in sentencing.
The Sentencing Guidelines emerged at a time when there was a national concern about unreasonable sentencing variation. The “majority of'the criticism regarding sentencing practices ... focused upon judicial discretion.” Sundberg at 4. In 1978, the Florida Supreme Court established a Sentencing Study Committee. Id. at 1 n. 2. The Committee’s “fundamental goal” was to “devise a system in which individuals of similar backgrounds would receive roughly equivalent sentences when they commit similar crimes, regardless of the differing penal philosophies of legislators, correctional authorities, parole authorities, or judges.” Id. at 3.
Significantly, to ensure that judicial discretion did not trump the fair sentencing approach of the guidelines, trial judges were required to delineate their reasons for departures from the guidelines, both orally and in writing. Fla. R.Crim. P. 3.702(d)(18) (1994). This court reviewed such departures under an abuse of discretion standard. See, e.g., Etienne v. State, 780 So.2d 1038, 1039 (Fla. 4th DCA 2001).
While the sentencing guidelines were well-intentioned, the criminal law became mired in the minutiae of scoresheets and whether a sentencing judge had articulated “clear and convincing reasons” for exceeding a presumptive guidelines sentence. Also, scoresheet issues proliferated in motions for postconviction relief. .
In 1998, the legislature replaced the sentencing guidelines with the Criminal Punishment Code, applicable to all noncapital felonies committed on or after October 1, 1998. In re Adoption of Fla. Rules of Crim. Proc. 3.704 and 3.992 to Implement *948 the Fla.Crim. Punishment Code, 721 So.2d 265 (Fla.1998); Ch. 98-204, Laws of Fla.; §§ 921.002-.0027, Fla. Stat. (2014). The legislature determined that it was “in the best interest of the state to develop, implement, and revise a sentencing policy.” § 921.002(1), Fla. .Stat. (1998). The Code “embodies” these “principles”:
(a) Sentencing is neutral with respect to race, gender, and social and economic status.
(b) The primary purpose of sentencing is to punish the offender. Rehabilitation is a desired goal of the criminal justice system but is subordinate to the goal of punishment.
(c) The penalty imposed is commensurate with the severity of the primary offense and the circumstances surrounding the primary offense.
(d) The severity of the sentence increases with the length and nature of the offender’s prior record.
(e) The. sentence imposed by the sentencing judge reflects the length of actual time to be served, shortened only by the application of incentive and meritorious gain-time as provided by law, and may not be shortened if the defendant would consequently serve less than 85 percent of his or her tern of imprisonment as provided in s. 944.275(4)(b) 3. The provisions of chapter 947, relating to parole, shall not apply to persons sentenced under the Criminal Punishment Code.
(f) Departures below the lowest permissible sentence established by the code must be articulated in writing by the trial court judge and made only when circumstances or factors reasonably justify the mitigation of the sentence. The level of proof necessary to establish facts that support a departure from the lowest permissible sentence is a preponderance of the evidence.
(g) The trial court judge may- impose a sentence up to and including the statutory maximum for any offense, including an offense that is before the court due to a violation of probation or community, control.
(h) A sentence may be appealed on the basis that it departs from the Criminal Punishment Code only if the sentence is below the lowest permissible sentence or as enumerated in s. 924.06(1). '
(i) Use of incarcerative sanctions is prioritized toward offenders convicted of serious offenses and certain offenders who have long prior records, in order to maximize the finite capacities of state and local correctional facilities.
§ 921.002(1), Fla. Stat. (2014).
The cost-benefit considerations contained in subsection 921.002(l)(i) later came into play during the 2008-09 fiscal crisis, when the legislature enacted section 775.082(10) “as a part of a cost-savings measure for the Department of Corrections, and the legislative staff analysis characterized the statute as a ‘prison diversion approach.’ ” Jones v. State, 71 So.3d 173, 175 n. 4 (Fla. 1st DCA 2011) (quoting Fla. Comm, on Ways & Means, Bill Analysis & Fiscal Impact Statement FOR CS/SB 1722, at 1 (2009)). ’ Section 775.082(10) requires courts to “sentence certain non-violent low-scoring offenders to a non-state prison .sanction unless the court finds that such a sentence could endanger the public.” Id.
Under the Code, section 921.0024 provides for the preparation of a scoresheet for each defendant, which takes into account the - severity of the defendant’s primary offense at conviction, additional offenses at conviction, and prior criminal history. These factors are scored and the resulting total establishes a defendant’s “lowest permissible sentence” which “is as *949 sumed to be the lowest appropriate sentence for the offender being sentenced.” § 921.00265(1), Fla. Stat. (2014). While the trial judge may impose any sentence up to and including the statutory maximum for an offense, the court may not impose a sentence below the lowest permissible sentence unless there is a valid mitigating circumstance to justify such a downward departure. § 921.0026(1), Fla. Stat. (2014).
Section 921.0026(2) sets forth a nonexclusive list of mitigating circumstances that might justify a valid downward departure. The reasons for a valid downward departure are subject to appellate review, “in stark contrast to upward departures for which reasons, need not be given at all” under the Criminal Punishment Code. State v. Faulk, 840 So.2d 319, 322 (Fla. 5th DCA 2003) (Sharp, J., concurring).
By reestablishing judicial discretion up to statutory, máximums, the Code makes a return to pre-1983 law. The Code embraces the same modified indeterminate sentencing structure that predated the Sentencing Guidelines — the “legislature establishes a maximum sentence for each category of criminal offense but provides the judiciary with the discretion to sentence an offender either to a specific period of incarceration or to a minimum-maximum range within the legislatively established limits.” Sundberg at 6. It is as if the Guidelines’ concerns about sentencing fairness, subjectivity, neutrality, and equality had petered out by 1998. The granting of unfettered upward discretion under the Code has opened Florida’s door to the excessive sentence imposed in this case.
The problem with such unlimited sentencing discretion is that after a defendant is convicted in a jury trial, too many judges impose the maximum sentence allowed under the Code, under the rationale that they are sending a message to criminals. This approach frustrates the legislative intent expressed in the Code because it ignores the sentencing factors contained in section 921.002(1). Also, there is no research which supports the view that a harsh sentencing “message” has its desired effect; it is not as if there is a rational market theory of criminality where would-be criminals make an empirical study of sentencing practices before deciding on the geographical location of their crimes. Relying on behavioral research, Judge Richard Posner of the Seventh .Circuit has cast doubt on the actual deterrent effect of long sentences. See United States v. Presley, 790 F.3d 699 (7th Cir.2015).

Appellate Courts May Address Constitutional Violations in Sentencing

Under the current view of the Criminal Punishment Code, “the general rule in Florida is that when a sentence is within statutory limits, it is not subject to review by an appellate court.” Howard v. State, 820 So.2d 337, 339 (Fla. 4th DCA 2002). “[A]n exception to the general rule against interfering with the length of a sentence” is “where the facts establish a violation of a specific constitutional right during sentencing.” Id. at 339-40; accord Evans v. State, 816 So.2d 742, 744 (Fla. 4th DCA 2002). Examples of such violations are: (1) when a sentencing court relies upon conduct for' which a defendant has been acquitted, Doty v. State, 884 So.2d 547, 549 (Fla. 4th DCA 2004), Cook v. State, 647 So.2d 1066, 1067 (Fla. 3d DCA 1994), (2) where a judge imposes a sentence based on the race, religion, political affiliation, or national origin of the defendant, Santisteban v. State, 72 So.3d 187, 197 (Fla. 4th DCA 2011), Nawaz v. State, 28 So.3d 122, 124-25 (Fla. 1st DCA 2010), Torres v. State, 124 So.3d 439, 442 (Fla. 1st DCA *950 2013), (3) where a judge takes his own religious beliefs into account in sentencing, Santisteban, 72 So.3d at 197, (4) where a judge improperly considers a defendant’s lack of remorse or failure to accept responsibility, Davis v. State, 149 So.3d 1158, 1160 (Fla. 4th DCA 2014), Moorer v. State, 926 So.2d 475, 477 (Fla. 1st DCA 2006), or (5) where a sentence is the product of judicial vindictiveness, Hall v. State, 823 So.2d 757, 762 (Fla.2002). One aspect of judicial vindictiveness is where, after a jury trial, a sentencing judge punishes a defendant’s refusal to accept a plea offer. See Mitchell v. State, 521 So.2d 185, 187 (Fla. 4th DCA 1988).
The prohibition against cruel or unusual punishment is another type of constitutional violation that can infect sentencing. In Miller v. Alabama, the United- States Supreme Court demonstrated a willingness to consider challenges to the proportionality of particular sentences outside the context of capital punishment. — U.S. —, 132 S.Ct. 2455, 183 L.Ed.2d 407 (2012). As the Court wrote,
The Eighth Amendment’s prohibition of cruel and unusual punishment guarantees individuals the right not to be subjected to excessive sanctions. That right, we have explained, flows from the basic precept of justice that punishment for crime should be graduated and proportioned to both the offender and the offense. As we noted the last time we considered life-without-parole sentences imposed on juveniles, the concept of proportionality is central to the Eighth Amendment. And we view that concept less through a historical prism than according to the evolving standards of decency that mark the progress of a maturing society.
Id. at 2463 (internal citations omitted).
More significantly, in Adaway v. State, the Florida Supreme Court interpreted United States Supreme Court decisions to allow a challenge to a sentence based on its length alone:
We read the decisions in Solem [v. Helm, 463 U.S. 277, 103 S.Ct. 3001, 77 L.Ed.2d 637 (1983)], Harmelin [v. Michigan, 501 U.S. 957, 111 S.Ct. 2680, 115 L.Ed.2d 836 (1991) ], and Ewing [v. California, 538 U.S. 11, 123 S.Ct. 1179, 155 L.Ed.2d 108 (2003)] as requiring, for a prison sentence to constitute cruel and unusual punishment solely because of its length, that at a minimum the sentence be grossly disproportionate to the crime. The Court itself has announced that it is “clearly established” that “[a] gross disproportionality principle is applicable to sentences for terms of years.” Lockyer [v. Andrade, 538 U.S. 63, 72, 123 S.Ct. 1166, 155 L.Ed.2d 144 (2003) ].
902 So.2d at 750.
The record in this case establishes that the sentence here was the type of “grossly disproportionate” sentence contemplated in Adaway. At the time of sentencing, appellant was 55 years old with no prior criminal record. He was not convicted of a crime of violence or intrusion into a dwelling. There was no physically injured victim. There was no weapon. He rejected a plea offer of 3 years. His recommended lowest sentence under the Code was 23.7 months in prison. After he was convicted at trial, the state argued for a 25-year sentence. The maximum sentence for the two charges was 35 years. The court sentenced him to consecutive sentences totaling 35 years. By comparison, appellant’s co-defendant, a twice convicted felon whose lowest permissible sentence was 47.1 months and maximum was 60 years, received a 15-year sentence. Given appellant’s age, the sentence was tantamount to a life sentence that violates the prohibition against cruel or unusual pun *951 ishment. See, e.g., Adams v. State, 188 So.3d 849 (Fla. 1st DCA 2012) (holding that sentence which required juvenile defendant to serve at least 58.5 years in prison was a de facto life sentence for non-homicide offense).
Appellant has marshalled convincing evidence that his sentence was grossly disproportionate to other similarly situated defendants in the 19th Judicial Circuit. During the fiscal year 2011-12, 84 defendants were sentenced to prison in the 19th Judicial Circuit who scored between 23.7 to 28 months under the Criminal Punishment Code. The mean prison sentence for these defendants was 51.11 months and the median prison sentence was 36 months. The sentence imposed most frequently was 36 months.
Appellant’s 420 month sentence greatly exceeded any of these numbers.[4] As appellant argues, “sentences for defendants with the same CPC score should be more uniform than sentences lumped together by offense.” This makes sense because a CPC score takes into account the characteristics of the offender, most notably his prior record, and characteristics of the offense committed, such as its severity, victim injury, and firearm possession, as well as additional offenses at conviction.
When compared to defendants sentenced to nonstate prison sanctions and those whose CPC score was higher,' the unusual punishment meted out to appellant becomes even clearer. Over the fiscal year 2011-12, 117 defendants in the 19th Judicial Circuit scored higher than appellant (23.8 or higher) and were sentenced to nonstate prison sanctions. Also, 433 defendants scored higher than appellant under the CPC, demonstrating a higher degree of blameworthiness — yet none received a sentence greater than appellant’s 420 month sentence. As appellant argues, “no defendant who was sentenced to prison in the 19th Judicial Circuit in fiscal year 2011-2012 could point to appellant and say that appellant was treated more favorably than himself.”
Disproportionately long sentences mask other constitutional violations in sentencing. First, in some courtrooms, sentencing is not “neutral with respect to race, gender, and social and economic status.” § 921.002(l)(a), Fla. Stat. (2014).[5] Second, in some courtrooms, some defendants receive a harsher sentence after they exercise their right to a jury trial. See The Sentencing Peoject (“It is widely acknowledged that defendants who go to trial and are found guilty instead of initially pleading guilty tend to receive harsher sentences; this is known as the ‘trial penalty.’ ”). Of course, this practice “chill[s] the exercise of [the] Fifth Amendment privilege against self-incrimination” and the “Sixth Amendment fight to have ... guilt or innocence determined by a jury.” Mc *952 Donald v. State, 751 So.2d 56, 58 (Fla. 2d DCA 1999).
Reversals, however, occur only when the record reveals an improper sentencing motive. See Gallucci v. State, 371 So.2d 148 (Fla. 4th DCA 1979); Stephney v. State, 564 So.2d 1246 (Fla. 3d DCA 1990). The silent imposition of a trial penalty evades appellate review. Similarly, sentences imposed without sufficient explanation can mask implicit biases, which are “activated involuntarily” and which “generally occur without our awareness or intentional control.” Hon. Dana Lee Marks, “Who, Me? Am I Guilty of Implicit Bias?” 54 ABA Judges’ Journal No. 4, 20, 22 (Fall 2015). Finally, the political reality is that judicial elections are not lost because of harsh sentencing. Indeed, a recent study concluded that the “pressures of upcoming reelection campaigns affect judicial decision-making in criminal cases, making judges more likely to impose longer sentences.” Kate BerRy, Bkennan Ctr. for Justice, How Judicial Elections Impact Criminal Cases 1 (2015).
Judicial silence presents an insurmountable obstacle to establishing a record of a constitutional violation in sentencing. Such difficulty is evident in eases like Mitchell v. State, where the court painstakingly examined the record and found nothing that supported an inference of vindictiveness. 521 So.2d at 190. The trial judge “made no remarks which would give any indication that the harsher sentence was being imposed as a punitive measure for rejecting the previous [plea] offer.” Id. It is the rare judge whose own words form the basis of a reversal of a sentence. For this reason, focusing on an objectively disproportionate sentence as cruel or unusual punishment is the preferable way to prevent constitutional sentencing violations.[6]
Here the trial judge’s stated reasons for the 35-year sentence do not justify the length of the sentence. The trial judge said that the crime — the stealing of boat motors — was committed with “great sophistication”; however, unlike a complex economic crime, the mechanics of this episode are hardly .sophisticated. Planning a crime and wearing gloves to avoid detection is not synonymous with sophistication. At oral argument, the state relied on the defendant’s Miami point of origin as a mark of sophistication. In the age of GPS technology, navigating to Martin County from Miami on 1-95 is hardly the hallmark of a sophisticated criminal mind.
The maximum sentence imposed in this case runs afoul of the principles that the “penalty imposed [be] commensurate with the severity of the primary offense” and the “severity of the sentence increases with the length and nature of the offender’s prior record.” § 921.002(l)(c)-(d). The most compelling argument against this sentence is that a 35-year sentence for a 55-year-old offender with no prior criminal record is in essence a de facto life sentence.
It also fails to “maximize the finite capacities of state and local correctional facilities.” § 921.002(1)©. In 1995, a legislatively created, task force identified as a core principle that the “state must preserve scarce criminal justice resources through the efficient delivery of services, the development of a cost effective range of sanctions, and the utilization of limited *953 prison beds for the worst offenders.” Task FoRce foe Review of Criminal Just. AND CORRECTIONS Sys., Final REPORT 1 (Jan. 1995).
Recognition of the practical “downside of long sentences is recent and is just beginning to dawn on the correctional authorities and criminal lawyers.” United States v. Presley, 790 F.3d 699, 702 (7th Cir.2015).[7] In Presley, the Seventh Circuit remanded a case to enable the trial judge “to consider whether to resentence the defendant” in light of the sentencing policies expressed in the opinion. Id. at 704. There, a 34-year-old with a lengthy criminal history was convicted of heroin and gun offenses and sentenced to almost 37 years in prison. Id. at 700-01. Writing for the majority, Judge Posner identified three sentencing policies that call into question the propriety of such a lengthy sentence.
First, the court questioned the deterrent effect of the long sentence. “Criminals, especially ones engaged in dangerous activities such as heroin dealing, tend to have what economists call a ‘high discount rate’ — that is, they weight future consequences less heavily than a normal, sensible, law-abiding person would.” Id. at 701. “[T]he prospect of being in prison at age 60 is less worrisome to a 30 year old than the prospect of being in prison today — and the higher his discount rate, the less worrisome the prospect.” Id. A long sentence may add “little additional deterrence, since every sentence increment is an increment in future, not present, punishment.” Id. at 701-02.
Second, the sentencing court in Presley failed to consider whether sentencing the defendant into his sixties was necessary to prevent.his return to criminal activities at that age.
Sentencing judges need to consider the phenomenon of aging out of. risky occupations. Violent crime ... is generally a young,man’s game.- Elderly people tend to be cautious, often indeed timid, and averse to physical danger. Violent crime is far less common among persons over 40, let alone over 60, than among younger persons.
Id. at 702.
Third, Judge Posner wrote that in evaluating a sentence there needs “to be considered the cost of imprisonment to the government, which is not trivial.” Id. “If the deterrent or incapacitative effect on criminal propensities fades sharply with time, the expenses incurred in .the incarceration of elderly persons may be a social waste.” Id. Prisoners over 50 cost prison systems more than younger prisoners, mainly due to increased medical costs. Id. The recidivism rate of released inmates over 50 is less than 19 percent. Id. In considering the optimal sentence for an elderly prisoner, Judge Posner concluded:
[Pjrobably the judge’s primary focus should be on the traditional triad of sentencing considerations: incapacitation, which prevents the defendant from committing crimes (at least crimes against persons other than prison personnel and other prisoners) until he is released, general deterrence (the effect of the sentence in deterring other persons from committing crimes), and specific deterrence (its effect in deterring the defendant from committing crimes after 'he’s released). 'A senténce long enough to keep the deféndant in prison until he enters the age range at which the type of criminal activity in which he *954 has engaged is rare should achieve the aims of incapacitation and specific deterrence, while lengthening the sentence is unlikely to increase general deterrence significantly if the persons engaged in the criminal activity for which the defendant is being sentenced have a high discount rate; for beyond a point reached by a not very - long sentence, such persons tend not to react to increases in sentence length by abandoning their criminal careers.
Id. at 703.
Under an evolving sense of what is an unconstitutional cruel or unusual sentence, the 35-year sentence in this case should not stand.

One view of the Due Process Clause is that it requires judges to state their reasons for a sentence

In the 1970s, many thoughtful commentators expressed concerns about sentences imposed without explanation. Judge Marvin Frankel -wrote a book that influenced sentencing reform in Florida and elsewhere — CRIMINAL Sentences: Law Without OkdeR (1973). ’ In it, he contended that a requirement that judges explain the reasons behind a sentence was a cornerstone of fairness:
The point ... is that the parties (especially the loser) are, on deep principles, not merely entitled to a decision; they’re entitled to an explanation.... The duty to give an account of the decision is to promote thought by the decider, to compel him to cover the relevant points, to help him eschew irrelevancies — and finally to make him show that these necessities have been served. The requirement of reasons expressly stated is not a guarantee of fairness. The judge or other official may give good reasons while he acts upon outrageous ones. However, given decision-makers who are both tolerably honest and normally fallible, the requirement of stated reasons is a powerful safeguard against rash and arbitrary decisions.
⅜ ⅜ ⅜
Since, as I have said, judges usually say little or nothing to explain their sentences, the possibility that they were moved by absurd or vicious considerations is not usually open to inquiry. And the circle proceeds to be closed. The judges, if they are merely human rather than depraved, do not enjoy being caught in error. They know that an unexplained decision does not flaunt its possible fallacies. When they are not required to explain, many at least find this conclusive grounds for not explaining. There is no way of knowing, then, how many sentences, ■ for how many thousands of years, have rested upon hidden premises that could not have survived scrutiny.
Id. at 40-42 (emphasis added).
One legal scholar has argued that the due process clause requires judges to explain their sentencing decisions. Michael C. Berkowitz, The Constitutional Requirement for a Written Statement of Reasons and Facts in Support of the Sentencing Decision: A Due Process Proposal, 60 IOWA L. REV. 205 (1974); see also Michael M. O’Hear, Appellate Review of Sentences: Reconsidering Deference, 51 Wm. & Mary L.Rev. 2123, 2125 (2010). Whether the hour for Professor Berkowitz’s modest proposal has come round at last will have to be decided by a Court higher than this one.
Adaway opened a constitutional door that appeared to have been closed in Hall. For the above reasons, I agree with the certified question contained in the majority opinion.

. The sentence here also greatly exceeded that of similarly situated defendants in the other circuits within this district. For such defendants, the 15th Judicial Circuit had a mean prison sentence of 34.51 months, and a median sentence of 27.15 months. The 17th Judicial Circuit had a mean sentence of 29.36 months and a median of 26 months.

. Statistical analysis demonstrates that in the United States there is significant racial disparity in sentencing decisions and these disparities rise with the severity of the given sentence. ACLU, Hearing on Reports of Racism in the Justice System of the United States (2014). Significantly, studies demonstrate greater racial disparity in sentencing nonviolent crimes. Id. at 3; see also Tushar Kan-sal, The Sentencing Project, Racial Disparity in Sentencing-. A Review of the Literature (Marc Mauer ed., 2005) [hereinafter The Sentencing Project] (noting Black and Latino defendants are often sentenced more severely than similarly situated White defendants for “less serious crimes,” such as drug and property crimes).

.' Various constitutional rights can be implicated in a sentencing. See Art. I, § 2, Fla. Const. ("No person shall be deprived of any right because of race, religion, national origin, or physical disability.”); Art. I, § 9, Fla. Const, (right to due process); Art. I, § 16(a) (right to “a speedy and public trial by impartial jury”.); Art. I, § 22 (right to a trial by jury).

. See, e.g., Joe Palazzolo, Prison Population Cuts Catch On, Wall St. J., Jan. 2-3, 2016, at A3.