DISTRICT COURT OF APPEAL OF THE STATE OF FLORIDA
FOURTH DISTRICT

**JABARI KEMP,**
Appellant,

v.

**STATE OF FLORIDA,**
Appellee.

No. 4D15-3472

[ July 31, 2019 ]

Appeal from the Circuit Court for the Fifteenth Judicial Circuit, Palm Beach County; John S. Kastrenakes, Judge; L.T. Case No. 502013CF006185A.

Carey Haughwout, Public Defender, and Karen E. Ehrlich, Assistant Public Defender, West Palm Beach, for appellant.

Ashley Moody, Attorney General, Tallahassee, and Allen R. Geesey, Assistant Attorney General, West Palm Beach, for appellee.

*ON POST-OPINION MOTIONS*

TAYLOR, J.

In light of *In re Amendments to Florida Evidence Code*, SC19-107, 2019 WL 2219714 (Fla. May 23, 2019), we withdraw our opinion dated May 8, 2019, which renders the State's amended motion for rehearing of that decision moot. We grant appellant's first amended motion for rehearing directed to our opinion dated December 13, 2017, and we substitute this opinion in place of our prior opinions.

Appellant, Jabari Kemp, appeals his convictions for five counts of vehicular manslaughter. The charges stemmed from an automobile crash that resulted in the tragic deaths of five young people. At trial, the principal issue was whether appellant operated "a motor vehicle . . . in a reckless manner likely to cause the death of, or great bodily harm to,

another." § 782.071, Fla. Stat. (2012).  A key factual dispute on this issue was whether appellant was in control of the car at the time of the crash. To prove this disputed element, the State relied on expert opinion testimony that appellant had applied the brakes before the crash.  The expert's braking opinion was based solely on his visual observation of crush damage to the victims' car.

We reverse for a new trial.  We conclude that the trial court abused its discretion in admitting expert testimony that did not meet the requirements of *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579 (1993).  The expert's braking opinion was not shown to be based upon sufficient facts or data, was not shown to be the product of reliable principles and methodology, and amounted to little more than a subjective and unverifiable opinion.

### *Facts*

On the night of the accident, appellant was driving a Mercedes coupe northbound on I-95 and exited at Blue Heron Boulevard.  According to the lead accident investigator, the curvature of the Blue Heron exit "would require a person to make their vehicle maneuver in such a way to make that curve."

Appellant's car sped down the exit ramp and ran the red light at the end of the ramp.  The car continued straight into the perpendicular lanes of traffic and crashed into the side of a Lexus sedan that was proceeding eastbound with the green light.  The State presented expert testimony that appellant's vehicle impacted the Lexus at about 128 mph.  Both cars went across the median and came to rest beyond the westbound lanes of traffic.

When paramedics arrived, appellant was awake but was "mostly in and out of consciousness."  Appellant had to be extricated from his vehicle.

The five young people in the Lexus died as a result of the accident.

One of the factual disputes at trial was whether appellant had lost consciousness shortly before the crash.  The State was required to prove at trial that appellant operated his motor vehicle "in a reckless manner likely to cause the death of, or great bodily harm to, another," which is a required element of vehicular homicide.[1]  However, evidence that a

---

[1] Vehicular homicide is defined as "the killing of a human being . . . caused by the operation of a motor vehicle by another in a reckless manner likely to cause the death of, or great bodily harm to, another."  § 782.071, Fla. Stat. (2012).

defendant merely lost control of a vehicle is insufficient, without more, to prove reckless driving. *Smith v. State*, 218 So. 3d 996, 998 (Fla. 2d DCA 2017).

Appellant's defense was that he fainted at the wheel and did not have control over the car at the time of the collision. He testified that he felt "very faint" about "a second or two" into the Blue Heron exit from I-95. He explained that he had never fainted before and did not know he was going to pass out. He recalled driving 65 to 70 mph before he lost consciousness. The next thing he remembered was waking up at the hospital.

Defense counsel argued that appellant's height and manner of sitting in the Mercedes likely caused appellant's foot to press on the gas pedal after he passed out. According to defense counsel, this would explain how the vehicle could have gotten up to 128 mph as appellant exited I-95. Appellant testified that he was 5'11", that his Mercedes sports car sat "kind of low," and that the gas pedal was "very responsive."

An eyewitness described seeing appellant's car coming down the off-ramp: "It was a flying like it was – it was like somebody was unconscious in the car just going, [vroom]. It was – I thought it was flying because it wasn't turning, it was just going straight. It was just, like – like a plane diving." According to this witness, appellant's car was not braking.

A police officer at an unrelated traffic stop about 400 feet away from the accident "heard the sound of tires screeching on a highway effectively applying brakes and then I heard a large pop or a bang which was indicative of a collision having occurred." However, the officer did not see the accident, nor did he know which car made the screeching sound.

Corporal Johnson was the lead investigator in the case. He testified that appellant's vehicle left tire marks on the exit ramp. He could not say

---

Vehicular homicide therefore requires proof of reckless driving—that is, driving with a "willful or wanton disregard for the safety of persons or property." *Santisteban v. State*, 72 So. 3d 187, 195 (Fla. 4th DCA 2011) (citations and internal quotation marks omitted). "Willful" means "intentional, knowing, and purposeful," and "wanton" means with a "conscious and intentional indifference to consequences and with knowledge that damage is likely to be done to persons or property." *Lewek v. State*, 702 So. 2d 527, 530–31 (Fla. 4th DCA 1997) (citations and internal quotation marks omitted). "In determining whether a defendant was driving recklessly, the essential inquiry is whether the defendant knowingly drove the vehicle in such a manner and under such conditions as was likely to cause death or great bodily harm." *Santisteban*, 72 So. 3d at 195.

that the tire marks were indicative of braking immediately before the crash. He explained that tire marks could be from steering input, braking, or "a number of factors." He claimed that tire marks would require driver input. However, he admitted that he could not state with certainty that appellant was in control of his vehicle at the time of the collision.

Corporal Johnson was assisted by Corporal Dooley, who performed the speed calculations.

Both issues on appeal arise from Corporal Dooley's testimony. Over appellant's Daubert[2] objection and another objection to the late disclosure of Dooley's braking opinion,[3] the trial court admitted Dooley's opinion that the damage to the Lexus indicated that appellant was braking his vehicle as the collision occurred.

Before trial, defense counsel specifically argued that Dooley's braking opinion should be excluded under Daubert because the opinion was not based on any calculations and lacked "a foundation in any form of science." The trial court did not rule on the Daubert issue at that time.

When Dooley testified, he explained that he inspected the vehicles after the accident for "crush damage," mechanical defects, tire malfunction, and damage profiles. Damage profiles show the angle of approach from the vehicle, how far the crush went into the vehicle, and the angle of departure.

Dooley claimed that sometimes there is damage that indicates whether braking occurred at the point of impact between two cars:

> [CORPORAL DOOLEY:] When you have two cars that are relatively similar in height . . . , as somebody is approaching a car . . . they are not paying attention or whatever it is, and at the last second they brake right before impact. And the front end will dip and it will go down and it will smack the rear of the car or whatever the case is. Normally, that's from you're

---

[2] *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993).

[3] We affirm as to appellant's argument that he was procedurally prejudiced by the State's discovery violation. Although appellant complained that he was surprised and ambushed by the State with Dooley's new braking opinion, we conclude that appellant was not procedurally prejudiced where: (1) defense counsel deposed Dooley shortly before opening statements; and (2) appellant insisted on going forward with the trial rather than requesting a continuance to retain his own expert on the braking issue.

4

traveling at a speed and as you hit the brakes, center mass, the momentum is going forward so it's going to push that momentum forward causing the front end to dip. I'm sure we have all done it, whether you accelerate and the front end goes up, or you hit the brakes and the front end goes down, but that's what we are looking for is how up the damage profile is. . . . What we have here is, up to here this is the right rear passenger door of the Lexus. And as you can see here, it's kind of bowed out a little bit, and then when you look further down you notice how it appears to get deeper and deeper and deeper. When you get down to the bottom of it that's the frame right there, okay? So when you look at this damage profile this to me is obviously a significant impact. But when you have all of this up here, which is kind of in line with whatever the car may or should have been, and then as you start looking down, down, down, it starts to get deeper and deeper and deeper as you get down to the –

At this point, the defense objected, and the court permitted voir dire before Corporal Dooley rendered his opinion:

[CORPORAL DOOLEY]: Well, when you have such a tremendous speed going down and so much energy and momentum, the car is -- if it's not dipping, or going up, or accelerating, it's going straightforward. Whatever it's going to hit and when it hits you would have the crushing factor. It would be more upright but, again, like I said, when I see this based on everything I've seen in the past, all my training and experience, it shows me that the car hits and goes down, is what it tells me. That's all I can testify to. That's what it tells me is that it hits but it's going down.

THE COURT: And that is consistent within a reasonable degree of scientific certainty with braking of the Mercedes?

[CORPORAL DOOLEY]: I can't tell you about the scientific -- or anything about the braking of the Mercedes. What I can tell you is the overall dynamics of a car to require to have shocks and struts and all these things and if you are accelerating, the front will go up. If you are decelerating it goes down -- that's all I can -- I'm just telling you what it means to me.

THE COURT: Is it consistent with braking?

5

[CORPORAL DOOLEY]: Yes.

THE COURT: Is it consistent with any other scenario other than braking?

[CORPORAL DOOLEY]: I, personally, cannot think of anything that it would be consistent with --

THE COURT: Okay.

[PROSECUTOR]: If I could ask him one additional question. . . . When the Judge asked you if it's within a degree of scientific certainty, when we talk about science what you are discussing deals with a car going downward, deals with the laws of physics and momentum, correct?

[CORPORAL DOOLEY]: Yes, ma'am.

[PROSECUTOR]: Okay. And that would be science?

[CORPORAL DOOLEY]: Yes, ma'am. . . .

[DEFENSE COUNSEL]: Are there any studies on this dipping effect, the curling downward?

[CORPORAL DOOLEY]: I'm sure that there are but I can't quote anything specific.

[DEFENSE COUNSEL]: None that you have read?

[CORPORAL DOOLEY]: Yes, we've actually -- when we go out and we do a lot of these more specific schools, like I testified to earlier . . . that I've attended, we go out and we will crash vehicles, we will throw motorcycles off the back of trucks and watch them spin, *but to classify like as actually studying I personally cannot recall anything specific dealing with it*. Other than talking about momentum in general when weights are transferred from the center mass forward because that's where the momentum was going. And as they apply the brakes, the momentum shifts forward, and as you accelerate, the momentum shifts backwards, talking about dynamics of how cars work. But as far as quoting an actual case study or a doctor or scientist or whomever may have been out there

6

looking at it, I can't tell you.

[DEFENSE COUNSEL]: Okay. And that would have nothing to do with the fact that the Lexus was a heavier vehicle at the time?

[CORPORAL DOOLEY]: Heavier vehicle and damage profile, I can't see any type of issue with that but it just appears like I said this, I'm just testifying as to what this looks like to me --

[DEFENSE COUNSEL]: Okay. Thank you. . . .

THE COURT: Corporal, is this -- is this type of downward arc in damage something that is taught at you know accident reconstruction classes that you have done?

[CORPORAL DOOLEY]: There are examples that are given. Unfortunately, you can't cover every single type of scenario that a crash will happen in, but no there are examples given and again explain to you how when a vehicles weight shifts and different things like that and we learn about speed calculations if a car swerved to avoid and all of the load goes to one side, and it will leave a tiny thin mark. We learn about weight transfer and momentum transfer, and then we go into when vehicles collide with others and how they transfer their momentum or kinetic energy to the other vehicle. But we do learn about these things, but I can't quote you anything specific off the top of my head as to a case study or somebody who is in the know, specifically.

(Emphasis added).

The trial court ruled that Dooley's braking opinion was admissible under *Daubert*, concluding that the opinion was based on Dooley's training and was sufficiently reliable to be admitted.

Dooley then testified that the crush damage to the Lexus went downward in "an arc-type fashion," which indicated that the front end of appellant's car was dipping as it was colliding with the Lexus. If a car is dipping, Dooley explained, this indicates "that there is some type of braking or driver input." Dooley asserted that if appellant's vehicle had not been dipping, there would have been "more of a flatter type crush pattern." Dooley claimed that the damage to the Lexus starts at the normal height one would expect, but arcs downward. According to Dooley,

7

it was the arc of the damage to the Lexus—not its height from the ground—that was indicative of dipping.

The jury found appellant guilty as charged on all five counts. The court granted a downward departure and sentenced appellant to five consecutive terms of six years in prison, for a total of 30 years in prison.

### *Analysis*

On appeal, appellant argues that Dooley's testimony did not meet the requirements of section 90.702, Florida Statutes, and *Daubert*. We agree.

### A. *Daubert Applies to This Appeal*

During the pendency of this appeal, there was considerable uncertainty concerning the standard governing the admission of expert testimony in Florida. Accordingly, we briefly explain why *Daubert* applies to this appeal.

Before appellant's trial in 2015, the legislature had adopted *Daubert* as the standard for the admission of expert testimony. *See* § 90.702, Fla. Stat. (2013) (incorporating *Daubert* standard into Florida Rules of Evidence); Ch. 2013-107, Laws of Fla., eff. July 1, 2013 (the "*Daubert*" Amendment).

At the time of trial, the amended version of section 90.702 had not been declared unconstitutional. The parties also relied upon this version of the statute at trial. Although the Florida Supreme Court later declared that the *Daubert* amendment was procedural in nature and that it unconstitutionally infringed on the Court's rulemaking authority, *see DeLisle v. Crane Co.*, 258 So. 3d 1219 (Fla. 2018), neither party challenged the constitutionality of the *Daubert* amendment below.

Because the parties never challenged the constitutionality of the amended version of section 90.702 below, the statute was presumed constitutional and the trial court was required to give effect to it when the case was tried. *See Mallory v. State*, 866 So. 2d 127, 128 (Fla. 4th DCA 2004). Indeed, at the time of trial, the trial court was bound by case law holding that the *Daubert* amendment to section 90.702 applied to pending cases. *See Perez v. Bell S. Telecomm., Inc.*, 138 So. 3d 492, 498 (Fla. 3d DCA 2014) (holding that the 2013 revision to section 90.702 should be applied retrospectively to pending cases); *see also Pardo v. State*, 596 So. 2d 665, 666 (Fla. 1992) (explaining that "in the absence of interdistrict conflict, district court decisions bind all Florida trial courts").

Within a few months after the *DeLisle* decision, the Florida Supreme Court adopted "the amendments to sections 90.702 and 90.704 of the Florida Evidence Code made by chapter 2013-107, sections 1 and 2." *In re Amends. to Fla. Evidence Code*, SC19-107, 2019 WL 2219714, at *3 (Fla. May 23, 2019). The Court adopted "the amendments to section 90.702 as procedural rules of evidence" effective immediately upon the release of its opinion. *Id.* Thus, because the Court has now adopted the *Daubert* amendment, the constitutional defect found in *DeLisle* has now been eliminated.

Under Florida's "pipeline rule," the "disposition of a case on appeal should be made in accord with the law in effect at the time of the appellate court's decision rather than the law in effect at the time the judgment appealed was rendered." *N. Broward Hosp. Dist. v. Kalitan*, 174 So. 3d 403, 412 (Fla. 4th DCA 2015) (quoting *Hendeles v. Sanford Auto Auction, Inc.*, 364 So. 2d 467, 468 (Fla. 1978)). Although the *Daubert* amendment may have suffered from a latent constitutional infirmity at the time of trial, the parties never raised any constitutional challenge below to section 90.702. Furthermore, as an appellate court, we are required to follow the law in effect at the time of our decision. Therefore, because the Florida Supreme Court's adoption of the *Daubert* amendment has eliminated the constitutional defect identified in *DeLisle*, we apply the requirements of *Daubert* and section 90.702 to this appeal.

### B. The Trial Court Abused its Discretion in Admitting the Expert's Opinion Under <u>Daubert</u>

Turning to the merits, we review the trial court's ruling on the admissibility of expert testimony under section 90.702 for an abuse of discretion. *Booker v. Sumter Cnty. Sheriff's Office*, 166 So. 3d 189, 194 n.2 (Fla. 1st DCA 2015).

Section 90.702, Florida Statutes, codifies the *Daubert* standard as follows:

> If scientific, technical, or other specialized knowledge will assist the trier of fact in understanding the evidence or in determining a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify about it in the form of an opinion or otherwise, if:
>
> (1) The testimony is based upon sufficient facts or data;

(2) The testimony is the product of reliable principles and methods; and

(3) The witness has applied the principles and methods reliably to the facts of the case.

§ 90.702, Fla. Stat.

Under *Daubert*, a trial judge has a gatekeeping role to "ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." 509 U.S. at 589. The trial judge is "charged with this gatekeeping function 'to ensure that speculative, unreliable expert testimony does not reach the jury' under the mantle of reliability that accompanies the appellation 'expert testimony.'" *Rink v. Cheminova, Inc.*, 400 F.3d 1286, 1291 (11th Cir. 2005) (citation omitted).

A trial judge must make "a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." *Daubert*, 509 U.S. at 592–93. This basic gatekeeping obligation applies not only to scientific testimony, but "to all expert testimony." *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 147 (1999).

The Supreme Court in *Daubert* outlined a list of factors that bear on the reliability inquiry: (1) whether the theory can be or has been tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) the known or potential rate of error of a particular scientific technique, as well as the existence of standards controlling the technique's operation; and (4) general acceptance in the scientific community. 509 U.S. at 593–94. The *Daubert* "test of reliability is flexible, and *Daubert*'s list of specific factors neither necessarily nor exclusively applies to all experts or in every case." *Kumho Tire*, 526 U.S. at 141 (internal quotation marks omitted).

"[T]he test under *Daubert* is not the correctness of the expert's conclusions but the soundness of his methodology." *Daubert v. Merrell Dow Pharm., Inc.*, 43 F.3d 1311, 1318 (9th Cir. 1995) ("*Daubert II*"). However, an expert's opinion must be based upon "knowledge," not merely "subjective belief or unsupported speculation." *Daubert*, 509 U.S. at 590. Nothing in *Daubert* requires a court "to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert," and "[a] court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).

Here, the trial court abused its discretion in admitting Dooley's braking opinion under *Daubert*. The trial court admitted the opinion without requiring that it satisfy any of the benchmarks of reliability set forth in *Daubert*. The record does not show that Dooley's technique—eyeballing the shape of the crash damage on a vehicle to determine if the vehicle that made the impact was braking—has been tested, has been subjected to peer review or publication, has a quantifiable rate of error, or is generally accepted in the field of accident reconstruction. Dooley's repeated invocation of the magic words "training and experience" was insufficient, without more, to establish the reliability of his opinion under *Daubert*.

Simply put, Dooley opined that because the damage to the Lexus went downward in an "arc-type fashion," appellant's car must have been dipping at the time of the collision, which indicated that appellant was braking.

Dooley's opinion can therefore be broken down into two distinct components: (1) applying the brakes causes the front of the driver's vehicle to dip downward; and (2) Dooley was able to look at the shape of the damage to the Lexus to infer that appellant's vehicle was dipping, and therefore braking, at the time of the collision. The first component of Dooley's opinion was supported by the laws of physics and momentum. But the second component of Dooley's opinion was never shown to be reliable.

Although Dooley initially implied that his braking opinion was based upon the collection of data, Dooley later admitted that his opinion was based solely on his visual impression of the shape of the damage to the Lexus. Dooley conceded that his opinion was not based on height measurements of the vehicles or the height of the damage to the Lexus, acknowledging at one point: "I'm just testifying as to what this looks like to me."

Dooley testified that "when I see this based on everything I've seen in the past, all my training and experience, it shows me that the car hits and goes down, is what it tells me. That's all I can testify to." At one point, Dooley admitted that he could not recall studying in his accident reconstruction classes the specific issue of the "curling downward" of damage due to the dipping effect:

> [W]e go out and we will crash vehicles, we will throw motorcycles off the back of trucks and watch them spin, **but to classify like as actually studying I personally cannot recall anything specific dealing with it**. Other than

11

> talking about momentum in general . . . . But as far as quoting
> an actual case study . . . I can't tell you.

(Emphasis added).

Dooley thus admitted that he had not studied this exact scenario in his course work. Later, however, when asked whether "this type of downward arc in damage" was something he was taught in accident reconstruction classes, he vaguely replied that "[t]here are examples that are given," that "you can't cover every single type of scenario that a crash will happen in," that he learned about "weight transfer" and "momentum transfer" in his classes, and that "we do learn about these things, but I can't quote you anything specific off the top of my head as to a case study or somebody who is in the know, specifically."

Contrary to the trial court's conclusion, Dooley's testimony does not actually support that he was taught how to examine the shape of crash damage to determine whether the vehicle that caused the damage was braking at the time of the collision. Where an expert is relying solely or primarily on his experience, the proponent of the testimony bears the burden "to explain how that experience led to the conclusion he reached, why that experience was a sufficient basis for the opinion, and just how that experience was reliably applied to the facts of the case." *United States v. Frazier*, 387 F.3d 1244, 1265 (11th Cir. 2004). Here, the prosecution did not meet its burden to explain how Dooley's experience led to the conclusion he reached, why that experience was a sufficient basis for the braking opinion, and just how that experience was reliably applied to the facts of this case.[4]

We conclude that Dooley's testimony was woefully insufficient to establish the reliability of his methodology under *Daubert*. There was no evidence that Dooley's methodology had ever been tested. Nor was there evidence that Dooley's methodology had been subjected to peer review and publication. Dooley could not reference any specific studies or peer-reviewed materials, much less any blind studies showing that it is possible

---

[4] The deficiencies in Dooley's methodology became even more apparent on cross-examination. Dooley admitted that he did no testing in this case to formulate his braking opinion. Dooley did not know anything about the metallurgy of the Lexus, whether the Lexus was weaker toward the bottom than the top, or whether the Lexus had been in any prior collisions. When asked how he could exclude the possibility that the damage to the Lexus was not "just as a result of the natural shape and weight of that Mercedes," Dooley essentially responded that his "training and experience" allowed him to reach such a conclusion.

12

to accurately infer braking from the shape of crash damage alone. Dooley assumed that there were studies on the "curling downward" of damage due to the dipping effect, but he could not "quote anything specific." Dooley did not specifically point to any experience or training where the occurrence of braking was determined solely on the basis of someone's visual impression of the shape of crash damage. For example, Dooley never testified that he received training in comparing collision damage known to have occurred after braking with collision damage known to have occurred without braking.

On this record, it is also impossible to quantify a potential rate of error for Dooley's methodology. Dooley's testimony failed to address what the "known or potential rate of error" was for attempting to discern braking from a visual inspection of the shape of crash damage to another vehicle. The absence of any testimony in this regard further undermines the reliability of Dooley's methodology.

The State also failed to show that Dooley's opinion was based upon a generally accepted methodology in the field of accident reconstruction. Dooley testified that his opinion dealt with science—specifically, the laws of physics and momentum. However, when asked whether the damage to the Lexus was "consistent within a reasonable degree of scientific certainty" with the Mercedes braking, Dooley simply replied: "I can't tell you about the scientific – or anything about the braking of the Mercedes. . . . I'm just telling you what it means to me." The best Dooley could do was reiterate the obvious point that the front of a car goes up when accelerating and goes down when decelerating. Thus, while the laws of physics and momentum provided a reliable basis for Dooley's testimony that the front of a vehicle dips downward while braking, there was no showing that simply looking at the shape of crash damage on a vehicle is a generally accepted methodology in the field of accident reconstruction for determining whether the vehicle that made the impact was dipping (and therefore braking) before the collision.

In short, Dooley's braking opinion was insufficient to satisfy *Daubert*. None of the *Daubert* factors supported the admissibility of the opinion. Dooley did not rely on any reliable methodology in formulating this braking opinion, and instead offered his subjective visual impression of what the damage to the Lexus "look[ed] like to [him]." There was simply too great an analytical gap between Dooley's observations and the opinion proffered.

### *Conclusion*

The improper admission of Dooley's testimony was not harmless. *See State v. DiGuilio*, 491 So. 2d 1129, 1135 (Fla. 1986). The dispute over whether appellant was braking at the time of the collision went to the heart of appellant's defense that he had lost consciousness immediately before the accident. We reverse and remand for a new trial.

*Reversed and Remanded.*

CIKLIN, J., concurs specially with opinion.
MAY, J., dissents with opinion.


CIKLIN, J., concurring specially.

I fully support the majority opinion and write to acknowledge the devastation suddenly inflicted upon the community when this unimaginable nightmare occurred on Saturday, April 13, 2013 at 12:20 a.m. Orane O. Cummings, Shonteria Grimsley, Christina Oliver-Joseph, Makita Campbell, and Jason Alexander Mahlung were innocent victims doing nothing else but going about their lives.

As our majority opinion indicates, this appeal boils down to the reliability and sufficiency of the state's conspicuously limited evidence pertaining to the decisive issue of Jabari Kemp's "control" over his vehicle at the time of this horrific event. The fundamental importance of this point cannot be overstated and, indeed, is the crux of the appellate review before us.

- By operation of law, Kemp cannot be guilty of vehicular manslaughter if he was and remained unconscious while traveling 128 miles per hour on the I-95 exit ramp in the seconds leading up to the fiery crash at the corner of the interstate and Blue Heron Boulevard.

- Whether or not the defendant applied his brakes before impact thus determining if Kemp was consciously in control of his vehicle, *has become the crucial line of legal demarcation* between a terrible accident on the one hand, and a culpable criminal act on the other.

- A paramount issue in this appeal is whether five young people were tragically killed because of an unthinkable yet unavoidable human occurrence requiring legal absolution, or at the hands of

a dangerously reckless driver who should rightfully be cloaked with a veil of criminality.

Other than the testimony of a non-eyewitness police officer handling an unrelated traffic stop some 400 feet away who heard "screeching," the sole evidence presented by the state as to the critical issue of the defendant's control and consciousness was expert-like testimony from FHP Corporal Dooley. The state presented no other witnesses to the jury and did not offer any type of additional evidence on the question of the defendant's "control" and consciousness. Other than Corporal Dooley's vehicle crush testimony, there was no other forensic or scientific evidence (such as tire tracks, skid marks, road scrapings or other markings on Blue Heron Boulevard indicating that any type of braking or even subtle maneuvering took place) to indicate that the defendant braked and was therefore conscious and legally in control at the time of impact.

During its closing argument, it is important to note, the state did not shy away from relying on Corporal Dooley's erroneously admitted testimony—thereby compounding the error by repeating it to the jury. This jury appears to have, understandably, given great deference to Corporal Dooley's purported expert testimony and thereupon convicted Jabari Kemp, leading to a 30-year prison sentence and what could have been, but for the mercy of the trial judge, a statutorily-permitted sentence of 75 years which, given the age of the defendant, would have been tantamount to a life sentence.

If Jabari Kemp committed vehicular manslaughter, our criminal justice system demands that he face the consequences of his chosen actions and the decisions he made. If he did not commit a crime, however, our system requires that he be acquitted and relieved of criminal responsibility in this matter. As a court of appeal, our responsibility is to pass judgment on the reliability, quality, and admissibility of Corporal Dooley's pivotal expert testimony.

This case comes down to the singular issue of the admissibility of Corporal Dooley's testimony in light of the statutory codification of *Daubert*. The Legislature exercised its prerogative to amend the Florida Evidence Code by adopting section 90.702 as follows:

> If scientific, technical, or other specialized knowledge will assist the trier of fact in understanding the evidence or in determining a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify about it in the form of an opinion or otherwise, if:

(1) The testimony is based upon sufficient facts or data;

(2) The testimony is the product of reliable principles and methods; and

(3) The witness has applied the principles and methods reliably to the facts of the case.

§ 90.702, Fla. Stat.

Based on the record before us, including Corporal Dooley's candid answers to the numerous questions asked of him by the defendant, the state, and the trial court, it simply cannot be held that his expert braking testimony was based upon legally sufficient facts or data that met the reliability and admissibility requirements of section 90.702. And although the state made a determined effort to render Corporal Dooley a braking expert, the principles and methodologies that formed the basis of Corporal Dooley's area of braking expertise did not fall within the ambit of section 90.702.

While the trial court took painstaking steps to ensure a fair trial, we must nevertheless find that reversible error occurred. A jury finding of criminal culpability must be based upon competent and reliable evidence, as defined by statute. To permit otherwise would undermine our institutions of law.

I assume the catastrophic event of April 13, 2013 must continually replay in the minds of every person who was touched by this tragedy. For most, the hurt must be on a horrible revolving loop. But that cruel reality cannot be permitted to obscure the central appellate issue before us and our obligation to insist that no legal errors be made—particularly when someone is convicted of very, very serious crimes.

Make no mistake. The state may ultimately be able to produce sufficient testimony and present the evidence necessary to lawfully convict Jabari Kemp, thereby holding him legally accountable for the devastation that took place in 2013. However, with the trial record that is before us, we have no choice but to hold that the state did not meet its burden in Kemp's first trial and that a new trial is warranted.

The gravity of our ruling does not escape us.


MAY, J., dissenting.

16

I respectfully dissent. The trial court did not abuse its discretion in admitting the opinion of the accident reconstructionist under section 90.702, Florida Statutes (2014). I would affirm.

Section 90.702 provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact in understanding the evidence or in determining a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify about it in the form of an opinion or otherwise, if:
>
> (1) The testimony is based upon sufficient facts or data;
>
> (2) The testimony is the product of reliable principles and methods; and
>
> (3) The witness has applied the principles and methods reliably to the facts of the case.

The United States Supreme Court has explained:

> Experts of all kinds tie observations to conclusions through the use of what Judge Learned Hand called "general truths derived from . . . specialized experience." And whether the specific expert testimony focuses upon specialized observations, the specialized translation of those observations into theory, a specialized theory itself, or the application of such a theory in a particular case, the expert's testimony often will rest "upon an experience confessedly foreign in kind to [the jury's] own." The trial judge's effort to assure that the specialized testimony is reliable and relevant can help the jury evaluate that foreign experience, whether the testimony reflects scientific, technical, or other specialized knowledge.

*Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 148-49 (1999) (citations omitted).

Here, there can be no doubt that Corporal Dooley was an expert in accident reconstruction. He testified that he had been employed with the Florida Highway Patrol for thirteen years and had been a homicide investigator for more than five years. His training was extensive. He testified about his training as follows:

17

It's very extensive, first and foremost you start off with the basic homicide investigations which kind of gets you into mathematical formulas and dynamics of how crashes happen and basically overall scene work and then you go into more advanced schools like advanced traffic homicide and reconstruction -- where that gets more into nuts and bolts of how to properly reconstruct a crash and then you get into more specific -- more advanced dealing with specific items like motorcycles, pedestrians, trains, commercial motor vehicles.

There is just a lot of stuff that as you progress it gets more and more specific. In total it's probably been -- if you would add it all up together probably in excess of 800 plus hours in the class room and actually out in the field doing this training prior to even investigating things.

He had been the primary investigator in more than sixty-five accidents and assisted in over two hundred. His role was to assist in "mapping the scene using [photogrammetry]." He was there to make an independent determination of how the crash occurred. From his observations, photographs, and measurements, he was able to construct a three-dimensional model of the accident scene. He was also able to create a crash zone using specific software.

Corporal Dooley conducted a post-crash inspection of the vehicles. He inspected the car for anything that happened as a result of the crash, such as "crush damage," mechanical defects, tire malfunction, and damage profiles. He explained the damage profile as providing information on the angle of approach, how far the crush went into the vehicle, and the angle of departure. The damage profile also provided information on whether braking occurred. He explained:

When you have two cars that are relatively similar in height . . . , as somebody is approaching a car . . . they are not paying attention or whatever it is, and at the last second they brake right before impact. And the front end will dip and it will go down and it will smack the rear of the car or whatever the case is. Normally, that's from [when] you're traveling at a speed and as you hit the brakes, center mass, the momentum is going forward so it's going to push that momentum forward causing the front end to dip. **I'm sure we have all done it, whether you accelerate and the front end goes up, or you hit the brakes and the front end goes down, but that's what we are looking for is how up the damage profile is.**

18

. . . .

> What we have here is, up to here this is the right rear passenger door of the Lexus. And as you can see here, it's kind of bowed out a little bit, and then when you look further down you notice how it appears to get deeper and deeper and deeper. When you get down to the bottom of it that's the frame right there, okay? So when you look at this damage profile this to me is obviously a significant impact. But when you have all of this up here, which is kind of in line with whatever the car may or should have been, and then as you start looking down, down, down, it starts to get deeper and deeper and deeper as you get down to the –

(Emphasis added).

At this point, the defense objected, and the court permitted voir dire before Corporal Dooley rendered his opinion. The voir dire was extensive. The judge asked many questions to fulfill his role as gatekeeper.

> [CORPORAL DOOLEY]: Well, when you have such a tremendous speed going down and so much energy and momentum, the car is -- if it's not dipping, or going up, or accelerating, it's going straightforward. Whatever it's going to hit and when it hits you would have the crushing factor. It would be more upright but, again, like I said, when I see this based on everything I've seen in the past, all my training and experience, it shows me that the car hits and goes down, is what it tells me. That's all I can testify to. That's what it tells me is that it hits but it's going down.
>
> THE COURT: And that is consistent within a reasonable degree of scientific certainty with braking of the Mercedes?
>
> [CORPORAL DOOLEY]: I can't tell you about the scientific -- or anything about the braking of the Mercedes. What I can tell you is the overall dynamics of a car to require to have shocks and struts and all these things and if you are accelerating, the front will go up. If you are decelerating it goes down -- that's all I can -- I'm just telling you what it means to me.
>
> THE COURT: Is it consistent with braking?

19

[CORPORAL DOOLEY]: Yes.

THE COURT: Is it consistent with any other scenario other than braking?

[CORPORAL DOOLEY]: I, personally, cannot think of anything that it would be consistent with --

THE COURT: Okay.

[PROSECUTOR]: If I could ask him one additional question. . . . When the Judge asked you if it's within a degree of scientific certainty, when we talk about science what you are discussing deals with a car going downward, deals with the laws of physics and momentum, correct?

[CORPORAL DOOLEY]: Yes, ma'am.

[PROSECUTOR]: Okay. And that would be science?

[CORPORAL DOOLEY]: Yes, ma'am.

. . . .

[DEFENSE COUNSEL]: Are there any studies on this dipping effect,
the curling downward?

[CORPORAL DOOLEY]: I'm sure that there are but I can't quote anything specific.

[DEFENSE COUNSEL]: None that you have read?

[CORPORAL DOOLEY]: Yes, we've actually -- when we go out and we do a lot of these more specific schools, like I testified to earlier . . . that I've attended, we go out and we will crash vehicles, we will throw motorcycles off the back of trucks and watch them spin, but to classify like as actually studying I personally cannot recall anything specific dealing with it. Other than talking about momentum in general when weights are transferred from the center mass forward because that's where the momentum was going. And as they apply the brakes, the momentum shifts forward, and as you accelerate,

the momentum shifts backwards, talking about dynamics of how cars work. But as far as quoting an actual case study or a doctor or scientist or whomever may have been out there looking at it, I can't tell you.

[DEFENSE COUNSEL]: Okay. And that would have nothing to do with the fact that the Lexus was a heavier vehicle at the time?

[CORPORAL DOOLEY]: Heavier vehicle and damage profile, I can't see any type of issue with that but it just appears like I said this, I'm just testifying as to what this looks like to me --

[DEFENSE COUNSEL]: Okay. Thank you.

. . . .

THE COURT: Corporal, is this -- is this type of downward arc in damage something that is taught at you know accident reconstruction classes that you have done?

[CORPORAL DOOLEY]: There are examples that are given. Unfortunately, you can't cover every single type of scenario that a crash will happen in, but no there are examples given and again explain to you how when a vehicles weight shifts and different things like that and we learn about speed calculations if a car swerved to avoid and all of the load goes to one side, and it will leave a tiny thin mark. We learn about weight transfer and momentum transfer, and then we go into when vehicles collide with others and how they transfer their momentum or kinetic energy to the other vehicle. But we do learn about these things, but I can't quote you anything specific off the top of my head as to a case study or somebody who is in the know, specifically.

. . . .

THE COURT: All right. The Court will admit this opinion. I'm admitting this opinion as a gatekeeper. I have through counsel's questions and the Court's questions undertaken an -- you know, an
examination of Corporal Dooley, as to reliability of this type of evidence.

I do find that it is quote/unquote not junk science, that, in fact, it is taught. It is part and parcel of the training with respect to accident reconstruction. That this -- a witness has -- certainly has the training and hours of experience to opine as to accident reconstruction. He specifically discussed the evidence that he has seen on the damage to the Lexus that corresponds to an opinion that -- of a dipping damage, which is consistent within his opinion of a car braking.

I'm going to allow the opinion to come in, subject, of course, to the weight of this opinion as being borne out by [defense counsel's] cross-examination, but I do find that this opinion is sufficiently reliable. <u>Daubert</u>, don't forget, is a rule of admissibility as opposed to inadmiss[i]bility. And I do find that it's not a pure opinion of the corporal but it's instead based on training, experience, he's got the expertise. And I do find as a gatekeeper that it is sufficiently reliable and sufficiently factually based to allow this opinion into the -- into evidence in this trial.

I may have some more with respect to a ruling on this but at this juncture I am going to allow the opinion subject to the weight to be
attached to it by a cross-examiner.

The court explained to the jury:

[Defense counsel's] objection to the opinion as to whether the Mercedes was braking or not, their objection to that is overruled. Of course, you decide what weight you wish to give to anyone's opinion, you can accept it or reject it, or accept part of it that's totally up to you -- I'm going to turn back now to the assistant State attorney to continue her direct examination.

Corporal Dooley then testified that the photographs showed the front end of the defendant's vehicle was dipping as the cars collided, indicating to him that "there [was] some type of braking or driver input." Without some type of braking,

you would have more of a flatter type crush pattern . . . that curvature to that crush damage that's what it tells me is that the car -- the front of the car that's doing the hitting is coming in and as it's hitting the front end is dipping and going down.

22

. . . .

> Transfer momentum transferring to the front of the car putting the load on the front.

As the Court declared in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 597 (1993): the trial judge is assigned "the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand. Pertinent evidence based on scientifically valid principles will satisfy those demands." Here, the trial court did just that.

It is significant to note that, earlier in the trial, the trial court sustained the same defense objection to Corporal Johnson when he attempted to render the same "dipping" opinion because the State had not shown the requisite reliability of his testimony. But after listening to Corporal Dooley's experience and training, he overruled the objection.

As the trial court noted, the admission of Corporal Dooley's testimony was based on physics and momentum, which is scientifically reliable. That evidence was admissible, and its weight was subject to defense counsel's cross-examination and closing argument. It was the jury's role to decide what weight to give the opinion.

The trial court did not err in its role as gatekeeper. First, as Corporal Dooley testified, the fact that the front end of the car lifts up when accelerating and dips down when decelerating is common knowledge. "I'm sure we have all done it, whether you accelerate and the front end goes up, or you hit the brakes and the front end goes down, but that's what we are looking for is how up the damage profile is." The majority acknowledges as much.

The majority agrees that the "laws of physics and momentum provided a reliable basis" for Corporal Dooley's opinion but then dissects the opinion into two parts and concludes the "second component" was not shown to be reliable. It refuses to recognize that those same laws of physics and momentum would allow for the accident reconstructionist to view the crash damage and render an opinion on whether the defendant's car was dipping downward at the time of the collision.

Second, the trial court permitted, and participated in, a significant voir dire of Corporal Dooley prior to determining the experienced accident reconstructionist's opinion was admissible. As the concurrence notes,

during that voir dire, Corporal Dooley's experience and training was explained. This provided the judge with enough information to determine whether his opinion bore the necessary indicia of scientific reliability.

Third, while Corporal Dooley could not point to specific training on this type of crash, his experience and training cannot be denied. He "had been employed with the Florida Highway Patrol for thirteen years, and had been a homicide investigator for more than five years." He had been the primary investigator in sixty-five accidents and participated in the investigation of another two hundred accidents. In short, his expertise was unchallenged.

Fourth, the majority notes that the lead investigator in the case testified that the defendant's vehicle left tire marks on the exit ramp, but he could not discern whether they indicated braking immediately before the crash. Defense counsel made much of this fact during his closing argument.

Fifth, the defense was able to argue to the jury its own theory of how the accident happened. According to the defense, the defendant lost consciousness, causing his foot to get stuck on the accelerator. Defense counsel argued there were no significant tire marks to support that the defendant applied his brakes prior to the collision. Defense counsel also argued that, because the defendant's car lost a front wheel, there was an alternative theory as to the dipping crush marks on the victims' car.

The concurrence suggests the State failed to present "other witnesses" on the question of the defendant's control of the vehicle. In reality, those that witnessed the accident did testify about the defendant's speed exiting the expressway and were even allowed to "opine" that "it was like somebody was unconscious. . . ." Another officer at an unrelated traffic stop "heard the sound of tires screeching on a highway effectively applying brakes. . . ." This testimony also supports the opinion of Corporal Dooley.

In short, the jury was served up competing theories for the cause of the accident with evidence to support those theories. It was the jury's responsibility to determine the weight given to that evidence and, ultimately, the defendant's guilt. *Custer Med. Ctr. v. United Auto. Ins. Co.*, 62 So. 3d 1086, 1098 (Fla. 2010) ("[I]t is the function of the jury to weigh and evaluate the evidence.").

For these reasons, I would affirm.

*        *        *

24